THE M. E. LUCKENBACH et al. (two cases).

(District Court, S. D. New York. May 7, 1908.)

COLLISION—OVERTAKING TUG WITH TOW—FAULTS OF OVERTAKING VESSELS.

The tug Luckenbach overtook and passed the tug Staples at night in Narragansett Bay. The tugs were on nearly parallel courses, and the Luckenbach passed to the right of the Staples. Each had a long tow. After passing, the Luckenbach changed her course across that of the Staples, and the rear barge of her tow ran between the Staples and her first tow; the hawser coming into collision with the Staples, sweeping away her upper works, and doing serious injury to her master and mate. *Held*, on the evidence, that the Luckenbach was in fault for close shaving, for changing her course when passing, for not giving the signals required by rule 8 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2882]), and for attempting to pass without obtaining the consent of the Staples, and that the barge was also in fault for sheering to port as she was passing.

[Ed. Note.—Overtaking vessels. See notes to The Rebecca, 60 C. C. A. 254.]

In Admiralty.

Butler, Notman & Mynderse and Baker & Thurston, for libellants.

Carl S. Petrasch and J. Parker Kirlin, for claimants as to personal injuries.

Peter S. Carter, for claimants as to personal effects.

ADAMS, District Judge. These actions were brought by Theodore B. Almy and Joseph Fingliss, respectively master and mate of the tug Cora L. Staples, to recover for personal injuries suffered in a collision between their tug and the hawser of the barge West Point, in tow of the tug M. E. Luckenbach, in Narragansett Bay about 4 o'clock A. M. of the 25th of January, 1907. The Staples was bound from the ocean to Fall River, Massachusetts, with 3 coal laden barges, the Sagua, the Parks and the Boyd, in tow on hawsers of about 125 fathoms each. The total length of the tow was about 3500 feet. The Luckenbach, a larger and more powerful tug, was proceeding through the ocean and bay to Providence, Rhode Island, with two coal laden barges, the Thomas and the West Point, in tow on hawsers. The total length of the tow was more than 2500 feet. The speed of the Staples and tow was about 4 knots; that of the Luckenbach and tow was from 6 to 7 knots. Both tows entered Narragansett Bay through the eastern passage, leaving the islands known as the Dumplings on the port side, then proceeding westward of Rose Island and to the eastward of Gould Island and then on a course of about north-east by north in order to clear Sands Point Light, on the eastern shore of Prudence Island. It was above the last named light that the collision occurred. The night was clear and cold. The tide fair, less than half a knot in strength.

The libellant Almy alleges the circumstances and the faults to have been as follows (and the allegations of Fingliss with respect to the collision were practically the same):

"About 4 A. M. the 25th of January 1907 the tug Cora L. Staples and the aforesaid barges were proceeding up Narragansett Bay through the channel between Prudence Island and Rhode Island off Sandy Point and heading on the regular course toward the light south of Hog Island. The tide was flood, the night was dark but fairly clear, and the regulation lights of said tug and barges were properly placed and burning brightly; each of said barges, in addition to her side lights, carried a bright white light at the stern. Said tow was proceeding at ordinary full speed and making about 4 miles an hour. The navigation of the Cora L. Staples was in charge of a duly licensed mate who was standing in her pilot house steering. A vigilant lookout was also stationed and attentive to his duties; all of the barges in tow of said tug were in charge of competent masters who were at their stations and attentive to their duties.

Third: Libellant further alleges upon information and belief that while said tug Cora L. Staples and her tow were proceeding as aforesaid the lights of a tow which afterwards proved to be the tug M. E. Luckenbach, proceeded against herein, with two barges in tow, the last of which was the barge West Point, were observed astern of the Staples tow, running at a high rate of speed and rapidly overtaking the latter.

The tug M. E. Luckenbach and her barges continued to overtake the Staples tow at a high rate of speed, passing on the starboard side of and about 150 to 200 feet therefrom; said tug M. E. Luckenbach gave no signals whatever to the tug Cora L. Staples or her tow while overtaking or passing said vessels. Until the tug M. E. Luckenbach was about off the bow of the barge Sagua the tug Cora L. Staples maintained her course and speed, but then the navigators of the Cora L. Staples observed that the M. E. Luckenbach was crowding somewhat toward the course of the Staples tow, and the engines of the Cora L. Staples were thereupon slowed to facilitate the safe passage of the Luckenbach tow. The tug M. E. Luckenbach and her tow continued on with unabated speed and when the M. E. Luckenbach was about abreast of the Cora L. Staples the speed of the latter was still further reduced and her helm starboarded and the tug M. E. Luckenbach was hailed from the Staples in order to ascertain the former's intended course, but no reply was received. When the M. E. Luckenbach was ahead of the Cora L. Staples the course of the Luckenbach was directed to port across the course of the Staples tow; the first barge in tow of the Luckenbach passed across the bow of the Cora L. Staples and about 75 feet distant therefrom. Your libellant on information and belief alleges that those in charge of the Staples tow then observed the last barge in tow of the tug Luckenbach, to-wit the West Point, take a rank sheer to port towards the stern of the Cora L. Staples, whereupon the engines of the Cora L. Staples were put full speed ahead and her helm put hard-a-starboard in order to avoid the threatened collision, and numerous danger blasts were given on her steam whistle to warn those in charge of the tug Luckenbach and the West Point of the impending danger. Orders were also given on board both the Cora L. Staples and the barge Sagua to cut the hawser between the said tug and barge, but before these directions could be carried out the barge West Point, running at a high rate of speed, crossed the hawser between the tug Staples and the barge Sagua, the hawser attached to the bow of the West Point striking with great force against the starboard quarter and deckhouse of the tug Cora L. Staples, ripping off the roof, breaking her mast and tearing out the pilot-house and smokestack and your libellant states that he was aroused by the blowing of the danger whistle on the Cora L. Staples and on going on deck was struck in the back by the hawser of the West Point which at about that instant came over the rail of said tug Cora L. Staples; that he was knocked down and severely injured. That immediately after this happened the Cora L. Staples was enveloped in steam and it was discovered that her pilot-house was carried away and the pilot, Joseph Fingliss, missing."

\*        \*        \*        \*        \*        \*.        \*        \*        \*        \*

"Fourth: Your libellant further alleges upon information and belief that the aforesaid disaster and the damages resulting therefrom were not caused or contributed to, by any fault or neglect on the part of the tug Cora L. Staples or any of her barges or of the persons in charge of said tug or bar-

ges, but were wholly due to, and caused by, the following among other faults and neglects, viz:

As to the tug M. E. Luckenbach:

(1) In that said steamtug although overtaking the tug Cora L. Staples and her tow, did not keep out of the way of the aforesaid overtaken vessels:

(2) In that although said tug and her tow were overtaking the Cora L. Staples and her tow, the tug M. E. Luckenbach gave no signals to said overtaken vessels indicating her desire or intention to pass libellant's tow:

(3) In that said tug attempted to pass the Cora L. Staples and her tow without having obtained by the interchange of appropriate whistle signals the consent of the overtaken vessels to such a course of navigation:

(4) In that said tug recklessly and negligently starboarded her helm and directed her course across the course of libellant's tow before the barge West Point was clear of the tug Cora L. Staples, thereby drawing said barge toward libellant's tow and contributing to said collision:

(5) In that said tug attempted to pass ahead of and across the course of the tug Cora L. Staples and her tow instead of passing under the stern of said vessels and on the port side thereof:

(6) In that although those in charge of the navigation of said tug knew or should have known that said tug Cora L. Staples and her tow were bound for Fall River, said tug Luckenbach attempted to pass on the starboard instead of the port side of libellant's tow:

(7) In that said tug and her tow attempted to pass the tug Cora L. Staples and her barges in dangerous proximity thereto and failed to allow a sufficient margin of clearance between said vessels:

(8) In that said tug proceeded at an excessive and dangerous rate of speed:

(9) In that no sufficient or proper lookout was maintained on board the said tug:

(10) In that said tug did not stop and reverse when danger blasts were blown by the Cora L. Staples:

(11) In that said tug was in charge of incompetent persons, and in such other and further particulars as the libellant may be able to point out upon the trial:

As to the barge West Point:

(1) In that said barge although overtaking the tug Cora L. Staples and her tow did not keep out of the way of said overtaken vessels:

(2) In that the person in charge of said barge negligently and improperly starboarded the helm of said vessel, thereby directing her course to port and across the hawser between the tug Cora L. Staples and the barge Sagua:

(3) In that the barge did not carry a port helm until clear of the Cora L. Staples:

(4) In that the course of said barge was directed to port towards the course of libellant's tow:

(5) In that no proper or sufficient lookout was maintained on said barge:

(6) In that said barge was in charge of incompetent persons who were not attentive to their duties, and in such other and further particulars as the libellant may be able to point out upon the trial."

The claimants' allegations against the Staples were as follows:

"Sixth: The claimants further answering the said libel and complaint allege upon information and belief:

That on the 24th day of January, 1907, the steamtug 'M. E. Luckenbach' was in charge of a competent master, officers and crew, and had a competent lookout kept; that her proper regulation masthead or towing lights, her side lights and her stern light, were properly set and burning brightly, and she had in tow the barge 'R. R. Thomas' astern on a hawser of about 200 fathoms, and astern of said barge was the barge 'West Point,' on a hawser of about the same length, each barge being in charge of a competent master, with a competent lookout kept, with their regulation side lights properly set and burning brightly, and the stern light on the barge 'R. R. Thomas' was properly set and burning brightly so that the barge 'West Point' could see the same to steer by. Said barges were loaded with coal and bound to Providence, Rhode Island.

That about 12 o'clock, midnight, of said 24th day of January, when said tug 'Luckenbach' and her tow had just come around Rose Island Light, and after passing said light,—the course of the steamtug was to be northeast by north until the tow passed Sands Point Light,—and while proceeding on her course, and when between Rose Island Light and Gould Island, four lights, bearing on about a range with Sands Point Light, were seen, and at first the person in charge of the navigation of the tug 'Luckenbach' was unable to distinguish which among the five lights was the light on Sands Point Lighthouse, but it was afterwards discovered that the four white lights were the lights on the barges in tow of the tug 'Cora L. Staples.' The steamtug 'Luckenbach' was then steering her regular course of northeast by north which brought these lights on the port bow. The speed of the steamtug 'Luckenbach' at that time was about six (6) knots an hour.

After proceeding for some time the tug 'Luckenbach' passed the stern barge of the 'Staples'' tow, when it was about between Gould Island Light and Fisk Rocks. At that time there was plenty of room and plenty of water, and the tug 'Luckenbach' was still steering northeast by north, and when passing the stern barge of the tow of the 'Staples,' she was passing with a safe margin. The 'Staples' was steering a parallel course with the 'Luckenbach' and making between three and four knots an hour. That at the time the tug 'Luckenbach' and her first barge got abreast of the tug 'Staples' they were still below Sands Point Light. After passing Dyer's Island, having plenty of water to the eastward, the course of the 'Luckenbach' was changed a half a point to northeast half north, and she continued on that course until she was abreast of Sands Point Light, a distance of about a mile and a quarter, when the tug was put back on her original course of northeast by north, and the tug continued on that course, heading northeast by north by compass. The course of northeast half north was changed before the tug got up to the tug 'Staples,' and when the 'Luckenbach' passed the 'Staples' they were a good distance apart, and the 'Luckenbach's' tow was kept in line and following after the tug. When the 'Luckenbach' had starboarded half a point the change widened the distance between the two tows until the 'Luckenbach' reached Sands Point Light, and the change of course back to northeast by north did not in any way lessen the distance between the tows, but put them back on the parallel course they were on previously.

The person in charge of the navigation of the tug 'Luckenbach' occasionally looked back from the window of the pilot house to see that the tow was following properly in line, and the tug exhibited two lights at her stern for the head barge to steer by, and the head barge exhibited a white light astern for the stern barge to steer by.

The person in charge of the navigation of the tug 'Luckenbach' believed that everything was right and that the tows were passing safely until he heard several short whistles astern, but whether they came from the tug 'Staples' or from the 'Luckenbach's' barges he was unable to determine. He immediately looked out of the port pilot house window and saw the masthead lights of the 'Staples' over quite close in line with the 'Luckenbach's' barges, and closer than when both tugs were running parallel, and the red lights of the 'Luckenbach's' barges could be seen about in line with the stern of the tug 'Luckenbach.' The lights of the 'Staples' were quite close to the line of the 'West Point,' but the 'West Point' was so far astern of the 'Luckenbach' it was impossible to judge how close she was to the 'West Point,' and it was thought that the 'Staples' was going under the stern of the barge 'West Point' to head up towards Fall River. Then the lights of the 'Staples' disappeared and the captain of the 'Luckenbach' ordered the mate, who was in charge of the wheel, to slow down at once, putting the tug under one bell. The captain then took charge of the 'Luckenbach' and the mate went down aft to shorten the hawser, and signals were given to the barges to shorten their hawsers. At that time it was not known on the 'Luckenbach' that a collision had happened. When the mate had hauled in the hawser from the first barge he went into the pilot house and it was then decided that something had happened, and the tug was turned around and went back, and when it had gone back a short distance a Fall River Steamer was seen throwing a search light

around, and the tug 'Luckenbach' went around the stern of the steamer, which was headed to the northward and westward. The escaping steam of the tug 'Staples' which was lying in that neighborhood, was heard, and she was discovered heading down the river in the opposite direction from that in which she had been towing, and, under the orders of the captain of the 'Luckenbach' a line was given to the 'Staples,' and she was hauled up alongside, but no lights were visible on the decks of the tug 'Staples'. By that time the tug 'Luckenbach's' barges had anchored. When the tug 'Luckenbach' got alongside of the 'Staples' it was discovered that the pilothouse, mast, and smokestack of the 'Staples' had been taken off of her, by said 'Staples' going under the hawser between the first and second barges in tow of the tug 'Luckenbach'. The libellant, captain of the tug 'Staples' came into the pilot house of the 'Luckenbach,' and thereafter the 'Luckenbach' proceeded to Fall River, and on her way she passed the barge 'West Point,' and found that said barge was not damaged. No whistles were blown at any time, except as hereinbefore mentioned.

Seventh: That the said accident was not caused through any fault, neglect or want of care on the part of the persons in charge of the navigation of the said steamtug 'M. E. Luckenbach' or the barge 'West Point,' but was caused solely through the negligence or want of care on the part of the libellant herein, or the persons in charge of the steamtug 'Cora L. Staples' and the barge 'Sagua,' as follows:

1st: In that said steamtug changed her course so as to go under the towline between the barges in tow of the tug M. E. Luckenbach:

2nd: In failing to keep a good and proper lookout:

3rd: In failing to keep her course and speed so as to be able to control the tug and her tow, and keep them away from the tow of the tug M. E. Luckenbach:

4th: That the persons in charge of the navigation of the Staples knows that the barge Sagua, by reason of her build, did not steer well, and also that the Staples was not a good steerer, did not exercise the care that the circumstances required of them to prevent sheering or change of heading on the part of the barge and tug, while the tug M. E. Luckenbach was passing:

5th: That the tug did not stop and reverse when her navigators finally saw the danger of getting across the hawser of the barge West Point:

6th: In such other and further respects as the claimants will point out on the trial of this action."

The principal controversy in the case is whether the disaster was due to a change of course on the part of the Luckenbach and tow to the port, or a change on the part of the Staples and tow to the starboard.

The testimony is very conflicting, each side vigorously contending that the other was in fault in this respect. The natural course of the Luckenbach in the vicinity of Sands Point Light was N. E. by N. and that of the Staples the same until the said light is abeam, then a change to N. E., on a flood tide is necessary. Each claimed to have been on its proper course shortly before the collision, that is the Luckenbach remained on N. E. by N. course and the Staples had changed to a N. E. course when passing the said light, and had gone half or three-quarters of a mile when the collision happened.

There is no question but that the Luckenbach was the overtaking vessel and it is urged by the Staples that she committed a grave fault in attempting to pass to the right of the Staples instead of to the left. It can not be doubted that if the latter course had been adopted, the accident would have been avoided, but the Luckenbach claims that she did not, and could not, know that the Staples would change her

course to go to Fall River. It seems that the Luckenbach's contention in this respect should be sustained, and the determination of the controversy rest upon other points.

Under the positions of the vessels, the burden was upon the Luckenbach, as the overtaking vessel, to show not only the prudence of her own conduct but the negligence of the other vessel. The Aureole, 113 Fed. 224, 232, 51 C. C. A. 181.

It is urged by the libellant that this burden of the Luckenbach is increased by her admitted failure to give a signal of her intention to pass, under rule 8, which provides:

"Rule VIII. (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2882.]) When steamvessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam-whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall put her helm to port; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam-whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall put her helm to starboard; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam-whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals. The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel."

On the other hand, it is urged that the rule is intended to deal with narrow waters and seems to contemplate a case where a dissent has been sounded in a narrow place. I do not think that the rule was designed for narrow waters only but for any waters where an attempt to pass would involve danger of collision. It was certainly the duty of the Luckenbach to signal her intention and to receive an assent to the proposed passing and the duty of the Staples to express a dissent when she became aware that a dangerous manœuvre was being attempted by the Luckenbach. No signals were given by either vessel until just before the collision when the Staples blew alarm whistles. The Luckenbach at the time was far ahead and the signals were useless. The Luckenbach was clearly in fault with respect to signals.

To recur to the question of a change of course, I find the facts to be that upon the converging courses, the tows were and had been in danger of collision for some little time. Originally they were both N. E. by N. It was the duty of both to continue such course until a deviation became justifiable. It is contended by the Staples that she continued that course until she reached the vicinity of the Sand Point Light, when she changed to N. E., bringing Hog Island about ahead, and that at the time of the change the Luckenbach was still astern of the Staples' last barge. The establishment of the contention is principally dependent upon the testimony of Fingliss at the wheel of the Staples, supported by the statement of the deckhand in the pilot house, who said he did not look for 3 or 4 minutes after Fingliss told him there was a tow coming up behind and then the Luckenbach was about abreast of the second barge.

The statements of the witnesses for the Staples, more in detail, were as follows:

The libellant Almy, the master of the Staples, after describing the vessels in his tow, said that the towing bitts on the tug were about 15 feet forward of the after line of the house; that he had gone off duty at 12 o'clock and to his room on the after end of the house; that the entrance thereto was through a room on the port side aft; that after reaching his room he went to sleep and was awakened by hearing several sharp, quick blasts of the whistle and got up and ran out to see what was the matter; that he saw a large black object, which afterward proved to be the West Point, a little on his port quarter; that he looked forward without seeing anything noticeable, and went around the stern to the starboard side and when he reached there a "great big hawser" came over the starboard quarter and struck him in the small of the back; that previous thereto he had seen that the tiller of the rudder, which was visible to him through the covering grating, intended for, but then not occupied by, the Staples' hawser, was hard to starboard directing the tug's heading to the port; that the hawser knocked him down and then carried off all the upper works, with the mainmast and the smokestack, sweeping from aft forward and carrying the wreckage to the port side; that the Sand Point Light, at the time, was abaft the tug; that the West Point after getting on the port quarter passed the Staples to the westward; that the blow knocked him unconscious and when he came to he found himself way over on the port side; that the steamer Cretan came to their assistance from the port side and afterward picked up the mate; that the Luckenbach after anchoring its tow came alongside and took him to Fall River, where he was taken home and remained about 5 weeks under a physician's care; the Staples was also taken to Fall River.

The libellant Fingliss, who was at the wheel, said he had already obtained the Fall River course when he first knew of the approaching tow; that the Sand Point Light was then slightly abaft his beam and after he changed he saw the tow coming at the stern, the Luckenbach then not having lapped the last barge of his tow; that he then saw the red light of the two barges in tow and those of the Luckenbach about 150 feet away from his tow; that the other tow was rapidly overtaking him and getting closer, estimated the distance at 100 feet to the westward and he sent his deck hand out to hail the Luckenbach and he did so but could get no answer; that the Luckenbach's tow proceeded on and seemed to be crowding him so he starboarded his wheel, when looking back he saw the last barge of the other tow take a sheer across the bow of his first barge and he hard a starboarded and gave from 10 to 16 rapid blasts of his whistle but the collision happened and on stepping out on deck on the starboard side he felt the hawser against his legs and in an instant he went overboard backward to port; that he saw the barge going by to the eastward of the tug, as he was sustaining himself by the wreck of the pilot house; that he was subsequently picked up by the steamer Cretan after having been in the water about an hour and a half and found that he was seriously injured; that before he went overboard he gave a last glance

at the compass and found the tug was heading about north, having swung from N. E.; that he was then taken to Fall River by the Cretan and left there; that the Luckenbach crowded upon his course and his first barge passed 40 or 50 feet away. On cross examination he said that when he first saw the tow, he saw three red lights, one on the tug and one on each of the barges; that when he first saw the other tow it was about 100 feet astern of his tow; that when the Luckenbach came abreast of him, he judged she was from 75 to 100 feet away.

The deck hand testified that he went on duty at 12 o'clock and after spending a half of an hour taking out some ashes, he went to the pilot house where he remained until the accident standing on the port side, while the mate was on the starboard side; that after the course was changed at Sand Point the mate looked out of the window and said "There is a tow coming up here"; that he did not look behind for three or four minutes after the mate's remark, then he looked and saw the Luckenbach was at about the second barge of his tow; that when the Luckenbach was abreast of his tug, under orders from the mate he went out, hailed the Luckenbach without getting an answer and went back to the pilot house; that the first barge of the tow got very close and the mate changed somewhat to the port under a starboard wheel; that the first barge passed clear 40 or 50 feet away and he noticed the second barge making a sheer for about the middle of his hawser and she sheered across the hawser between the Staples and the first barge; that he was sent back to cut the hawser; the hawser and something swept him off the pilot house deck to the main deck; that while he was running back on the upper deck he saw the West Point a little on the port quarter of the Staples aft; that the hawser first struck the stern and then swept forward; that when he saw the sheer of the West Point she showed, and continued to show, her green light. The mate on being recalled for further cross examination said that when he noticed that the other tow was lapping he did not think there was going to be a collision but that it was doing something that was not right.

Another witness for the libellants was the master of the barge Sagua, the leading barge in the Staples' tow. He said that when about abreast of Sand Point Light, he saw the Luckenbach astern of the last barge in his tow; that the tow was then on a N. E. course heading for the light on Hog Island, and was about three-quarters of a mile off Sand Point, so that the Luckenbach could very easily have passed on the port side; that she passed on the starboard side not, as he thought, more than 100 feet distant; that the first barge of the other tow was nearer, if there was any difference, than the tug; that when the Luckenbach was about opposite the Staples, he heard some one on the Staples calling out but could not hear what was said; that shortly after the Luckenbach passed the Staples, the former began to haul across the latter's bow; that about the time the stern barge of the other tow was abreast she was quite close so that the witness thought she was going between his barge and the Staples; that he instructed one of his crew to go forward and out the hawser but before he reached there, she ran into the hawser and it parted; that the West Point was so close in passing that she seemed to be sheering all the time; that he saw her hawser go over the

Staples and clean her off; that she passed on the port side of the Staples and the Luckenbach tow kept right on; that the collision happened when they were one-third to one-half way between the two lights; that they shortly after anchored, and later pulled in the hawser leading from her bow; that after the West Point's sheer, the hawser fell loose on his bow and it was found to have been parted and stranded; that it was not true that the Staples sheered to starboard and crossed the Luckenbach's hawser.

Opposed to these statements is the testimony of the master and the mate of the Luckenbach, and the master of the West Point.

The mate at the wheel, who relieved the master at midnight, said that when they reached a point off Rose Island, he noticed a number of bright lights a little on his port bow, bearing on Sand Point so that he could not distinguish the light there; that he was then on a course of N. E. by N. and shortly noticed that he was overtaking the lights and began to pass the Staples' tow about Fish Rock, just above Gould Island and about a half of a mile from the lower end of Prudence Island, the Staples' tow then being about on the same course that he was pursuing; that he was passing at a distance of 100 to 150 yards; that he kept the same course until he was about Dyers Island, when he changed ½ point to the eastward, to N. E. ½ N., to give the other tow plenty of room; that he continued on that course until he reached Sand Point, when the Staples was about abreast of the Luckenbach, the same distance off, and he changed back and steadied on a N. E. by N. course; that he shortly after called the master who was in his room aft of the wheel house.

The master said, on being called, that he looked out of a window in the after part of his room, which was located in the building on the upper deck; that this building contained the master's room and the pilot house; that he saw his tow coming along, the other tow and Sand Point Light, 500 or 600 feet below him; that his tow was then from a quarter to a half of a mile off shore; that his own tow was following reasonably straight behind, the first barge showing both lights and the stern barge the green light; that the Staples was then about abreast of his head barge and from 100 to 150 yards away; that the tows were then on about the same course and no danger was apparent; that his attention was arrested by some whistles and he directed the mate to slow down; that he then went into the pilot house to take charge and immediately upon looking out of the window, saw nothing of the lights of the Staples, but could see her; that he did not hear any noise or crash and did not know anything had happened; that he did not think there had been a collision, and could hardly account for the tug getting so much under the Luckenbach's stern as to cover up her lights; that upon going back he found what proved afterward to be one of the Philadelphia steamers, the Cretan, swinging a search light around, next was the Fall River steamer swinging her search light around, and next he was hailed by some one on the Staples who said: "We are wrecked, come and get hold of us"; that he then approached the Staples which was heading about west, on her starboard side, on

account of wreckage on the port side; that as far as he knew it was slack water, because his barges which had been- anchored heading up stream, did not swing around; .that he should say that the collision took place not 50 yards above Sand Point; that the master of the Staples said- to him, that he did not know how it could happen unless his head barge took a rank sheer causing the Staples to sheer in toward the Luckenbach's tow, that he had had trouble with the barge since leaving Jersey City, she was a heavy barge and possibly something of that kind happened; that the after part of the Staples was all covered with wreckage while the forward part was all clear, the masts were swept from starboard to port; that the damage had indicated that the hawser had struck on the starboard side somewhere about the forerigging; that his speed was 6 to 6½ knots; that when he came into the pilot house the boat had not quite reached a point where it was usual to haul around to the westward to go to Providence; that point of changing, from N. E. by N. to N., is marked by the range light on Bristol Ferry Point with Hog Island. On his cross examination, it appeared that he testified before the Local Inspectors that when he first went into the pilot house that Sand Point Light was a quarter of a mile astern of abeam of the Luckenbach, so that the light would be two or three points on her port quarter and a good half or three quarters of a mile off.

The master of the West Point said he came on watch at 12 o'clock and overtook the Staples and tow on the way up toward Prudence Island; that another man was at the wheel and apparently steering correctly; that the witness was on duty and had been on deck till about 10 minutes before 4 o'clock at which time they began to overlap the other tow and were passing it about 150 yards off; that both tows were heading nearly the same, "they were heading in a little closer" but the witness did not think there was any danger in the situation and he went forward underneath the top deck and was there until he heard whistles, when he ran up on deck and saw the other tug "almost right across our hawser" and saw her starboard light; that it appeared to him that she was already in contact, heading to the starboard of the Luckenbach almost across her bow; that he was excited but saw the smoke-stack and mast of the Staples go over the side and she drifted down to the starboard of the Luckenbach; that it appeared to him that his hawser struck the Staples' bow and took her smoke-stack and mainmast last; that when he came up "it seemed that our head barge was a little bit on our starboard bow * * * about half a point as near as I could judge in the excitement"; that when he came out he thought they were a little below Sand Point Light. On the cross examination he said that his barge might have sheered a little but not much; that he did not recollect having testified before the Inspectors as follows:

"Q. Did your barge cross over between the Staples and her first barge? A. Well, that I don't know; it might probably have done so, she must have I suppose."

The transcript of the Inspectors' minutes, however, showed that he did so testify.

Another witness for the claimants was the master of the barge Thomas, the leading barge in the Luckenbach's tow. He said that he was steering his barge when passing the Staples and tow and passed them 100 to 150 yards away; that he left the pilot house in charge of another wheelsman to go forward to arrange about anchoring and then he saw both of the West Point's side lights; that when he reached the forecastle head he heard some toots from the Staples and looking over the port side he saw only two green lights, close together, and three masthead lights; that he then heard some cracking and people hollering and then all the lights went out excepting one green light, which he took to be on the West Point.

It will be noticed that the Luckenbach's testimony shows that while the tows were passing, she changed half a point to the eastward to give the other tow plenty of room; that when in passing the tugs were about abreast and she changed back to her former course; that when the master looked astern the first barge was showing both lights to him; while the last barge was showing her green only; that he next saw the lights of his barges and the Staples all crowded together; that the master of the West Point noticed that the tows were getting closer while on their general courses; and he admitted that he was excited when making his observations.

I think that the preponderance of the testimony is decidedly in favor of the contention of the libellants that there was no change of course on the part of the Staples after the Luckenbach commenced her endeavor to pass to the starboard. Whether there was any change on the part of the Luckenbach other than from N. E. ½ N. to N. E. by N., described above, is not so clear, but, in any event, that change was enough to bring the tow of the Luckenbach in dangerous proximity to the Staples and the former should be condemned for close shaving as well as for the change of course just mentioned. She was also in fault for not giving a signal when overtaking and for proceeding without an assent to a proposed method of passing.

It is not contended that the Luckenbach had a lookout. It is not necessary, however, to go beyond the foregoing to establish faults on her part but it is probable that such faults were not the sole causes of the disaster, because it is likely that unless the West Point sheered to port, the change to port on the part of the Staples would have avoided the collision, but all efforts in the extremity were rendered useless by the sheer of the West Point. It is impossible to determine the extent of such sheer, as that would depend upon the distance the tows were apart, and the estimates vary from 75 feet to 450 feet, but it appears it was sufficient, in connection with the close shaving of the Luckenbach to produce the collision. The testimony on the part of the Staples that the West Point sheered considerably is confirmed by the statements of the master of the Luckenbach, and of the master of the Thomas, who said they saw the West Point's green light immediately prior to the collision. The latter said that it was the only light of those previously seen that appeared after the collision.

There will be a decree in favor of the libellants against the Luckenbach and West Point, with an order of reference.