Waite, G, J.
I have had no difficulty in reaching the conclusion that the torch-light was not shown from the schooner until it was too late for the steamer to avoid the collision, and that if it had been shown at a proper time no damage would have been done. Although all the witnesses from the schooner concur in saying that some minutes elapsed after the light was displayed before the vessels came together, it is clear to my mind that they were mistaken. Mere estimates, by witnesses in collision cases, as to time and distance can rarely be relied on with confidence. It is always safer in determining such questions to be governed by the attending facts and circumstances.
The lights were first brought to the attention of the five persons looking out from the steamer at the time by its reflection on the sails and rigging of the schooner, and they all saw it simultaneously. This, I think, must have been when the mate' was coming out from the cabin with the torch lighted, and before he got on deck. Under such circumstances the reflection would almost necessarily be seen before the light itself. Immediately afterwards the torch was seen for a moment only by the two lookouts on the bow, and the pilot at the starboard end of the bridge. The captain, at his place near the middle of the bridge, and the second officer at the port end, did not see it at all, as the hull of the steamer intercepted their view, and it was soon shut out from the others in the same way. These facts are fully established, and satisfy me that the reflection was seen as soon as the mate came out from the cabin, and that the vessels must have been very close together.
The testimony from the schooner is to the same effect, and *915 equally conclusive. The mate saw the green and white lights of the steamer when he thought she was a good, distance away, and not anticipating any danger went forward to look for vessels ahead. While he was there the steamer changed her course so as to expose her- red and white lights, and yet near enough to render her cabin lights visible. This was noticed by the man at the wheel, but, as he thought she would pass to the leeward, he did nothing, and gave the mate no warning. A while afterwards the mate turned aft to see where tha steamer was, and not finding her lights off to the starboard stooped down, and, looking under the yawl, discovered her red light. He started immediately for the torch in the cabin, and ran as fast as he could, telling the man at the wheel there was a steamer behind, and that he was going to show her a light. The captain in the cabin hearing what the mate said reached for the torch, but before he could get it out of the case the mate snatched it from him. The captain then removed the chimney from the lamp, and the mate, after lighting the torch, ran back on the deck as fast as he could, the captain following him. As soon as the mate got on deck he swung the light over the taffrail. All this indicates haste and excitement, and is entirely inconsistent with any idea that the steamer was five or six minutes away when the light was exposed. Unless I disregard entirely the testimony of all the witnesses from the steamer, and pay no attention to what happened on the schooner, I must find, as I do, that when the torch was first brought out from the cabin the collision was imminent, and could not have been avoided.
The rule is imperative which requires a steamer to keep out of the way of a sailing vessel, and this whether the steamer is overtaking a sailing vessel or passing her from the other way. But it is equally imperative on the sailing vessel in the night-time to notify the steamer of her presence and position by the display of such lights and signals as the law or the usages of navigation prescribe. If she fails, in this, and a collision occurs on that account, she must bear the loss. Section 4234 of the Revised Statutes requires that every sailing vessel “shall, on the approach of any steam- *916 vessel during the night-time, show a lighted torch upon the point or quarter to which the steam-vessel shall he approaching.” This seems sufficiently broad to cover all cases, but the libellants contend it does not require the light to be exhibited to a steamer coming up astern. Certainly, there is nothing in the language to indicate any such exception. The light is to be exhibited on the approach of any steam-vessel in the night. Nothing is said about the direction, thus implying that the signal must be given if the approach is from any quarter.
The rule is of comparatively recent origin, having been adopted by congress for the first time in 1871, (16 St. 459, | 70,) and was undoubtedly intended to supply a defect in the regulations of 1864, (13 St. 58,) which only required a sailing vessel, when under way, to carry her colored side lights, and they could not be seen astern. Under such circumstances a vessel coming up from behind had nothing to guide her. except the hull or sails of the one ahead, when they can be seen. When both were sailing vessels this was comparatively unimportant, because it is rare that the speed of the following vessel is such as to prevent her from getting out of the way after she is near enough to see what is ahead. With steamers, however, it is different. For this reason, when such a vessel was approaching, another light seemed sometimes to he necessary, and the torch was provided. As the side lights were visible ahead, it is clear that the primary object of the additional rule must have been to show a light behind where there was none before.
It is objected, however, that this would require a lookout at the stern as well as the bow, and, therefore, such could, not have been the intention of the rule. The office of a lookout is to watch for and report danger from whatever quarter it may be expected. It it can come from behind, he must look there enough to see when it is approaching and give the necessary warning. He must be stationed where, under the circumstances of the situation, he can best perform all his duties, and if one cannot do all that is required another must be added. Ordinarily, on a sailing vessel in open *917 ■waters, one is enough for all purposes, and his station will be at or near the bow. From there he can usually see a steamer coming up behind in time to give the necessary warning without interfering with his duties ahead. But, whether that be so or not, it is clear that the rule contemplates the keeping of a sufficient watch over the stern to enable the vessel to perform her duty as to the lights, and if the situation is such that one lookout is not enough there must be more.
It is next insisted that as the Sarmatian was a British vessel, and by the laws of Great Britain sailing vessels are not required to show torch-lights, the schooner can recover notwithstanding she exhibited hers so late. The two vessels were at the time on American waters and not on the high seas; they were in the Chesapeake bay, and infra fauces terree. A vast majority of the commerce carried on there was coastwise and local. The Sarmatian was subject to-the operation of pilot law and within the limits of pilot service. If she had attempted to proceed without a pilot, after-one could have been had, she would have been guilty of a breach of duty, and liable to her shippers and insurers for any loss on that account. While the rules of navigation adopted by congress are only intended for the government of-vessels of the navy and mercantile marine of the United States, no vessel forming part of that marine can excuse herself from following their requirements while in the waters of the United States and on pilot ground, simply because the-vessel it meets is sailing under a foreign flag. Pilots are employed not only to keep a vessel on her proper course, but to enable her to understand the local usages governing the navigation of the waters in which she is sailing. As the law requires a foreign vessel to have a pilot on board, it is to be presumed he will be at his post and govern himself by the rules prescribed by the proper authorities regulating navigation in that locality. Under such circumstances every pilot has the right to believe that all vessels he meets will do what, the local laws or usages require of them and act accordingly.
While the acts of congress may not be binding on foreign vessels, the local usages growing out of these observances- *918 are. The Fynewood, Swabey, 374. I see nothing in the cases oí The Zollverein, Swabey, 96; The Saxonia, 1 Lushington, 410; The Dumfries, Swabey, 63; or The Chancellor, 4 Law Times Rep. 627, to the contrary of this. The acts complained of in The Zollverein, The Dumfries and The Chancellor were all on the high seas, off from pilot ground, and the authority of The Fynewood, .subjecting :a foreign vessel to liability for the non-observamee of local usages in territorial waters, is clearly recognized in The Saxonia, (p. 421,) where the Eclipse was condemned, not because she did not carry the regulation lights, but because she showed no light at all until it was too late to prevent the collision. As was said by the master of the rolls in the case of The Saxonia, (p. 422,) “no blame can attach to a vessel for running foul of another vessel if it has been impossible to distinguish it until the collision was inevitable.” .In the condition the schooner in this case was, with the edge of her sails towards the steamer and her small hull low in the water, at the darkest hour in the night, it is clear beyond question that she could not be seen from the steamer unless something was done to make her presence known. If as against a foreign vessel she was not bound to show a torchlight, she certainly was not at liberty to abstain from doing anything calculated to give notice of her position, and of the danger the steamer was approaching. Had she shown her torch-light in time it would have been enough, but as she neglected that, and did nothing else calculated to effect the same object, she was clearly at fault under the general rules of the sea, as well as the statutory rules. This brings her within the rule under which the Eclipse was condemned as against the Saxonia, and is enough for the purpose of this case.
It is next contended that the Sarmatian was at fault for going too fast. She was proceeding at her usual speed in an open sea. While the night was dark, it was clear, and lights, when displayed, could easily be seen. She had a full watch on deck, attending to all their duties. She was not bound to slacken her speed until there was apparent danger, (The Scotia, 14 Wall. 181,) and she had the right to'act on the belief that every vessel she approached would give such no *919 tice as the local usages of the place, or the general rules of the sea, required. In order to know what the local usages were she took a licensed pilot on board. Under these circumstances she might keep up her usual speed until something appeared to make it improper. Had the schooner performed her duty this speed would not have involved any losa to her.
On the whale, I am satisfied that the decree below was right, and a decree may he entered here dismissing the libel, with costs in both courts.