## THE VIRGINIA.

## THE S. M. SPALDING.

Circuit Court of Appeals, Second Circuit.
April 9, 1928.

No. 179.

1. **Collision** ⚖➟71(2)—Overtaking vessel held at fault in part for collision with vessel at anchor, when engines were reversed to avoid collision with overtaken vessel (33 USCA §§ 109, 113, 203).

Overtaking vessel, speed of which was excessive, and which failed to keep out of way of overtaken vessel, *held* at fault in part for collision with third vessel lying at anchor, when engines were reversed to avoid collision with overtaken vessel, under 33 USCA §§ 109, 113, 203 (Comp. St. §§ 7863, 7867, 7892).

2. **Collision** ⚖➟99—Vessel held at fault in proceeding through congested waters of river without officer standing in position to let go anchors.

Vessel proceeding up river through congested waters *held* at fault for failure to have officer standing in position to let go anchors.

3. **Collision** ⚖➟94—Overtaking vessel need not anticipate improper navigation on part of overtaken vessel (33 USCA § 109).

Though overtaking vessel is at fault for failing to keep out of way of overtaken vessel, under 33 USCA § 109 (Comp. St. § 7863), overtaking vessel need not assume obligation of anticipating improper navigation on part of overtaken vessel.

4. **Collision** ⚖➟115—Overtaken vessel, changing course when overtaking vessel was two ship lengths astern, held at fault in part for collision between overtaking vessel and vessel at anchor.

Overtaken vessel *held* at fault in part for collision between overtaking vessel and vessel lying at anchor, occasioned when overtaking vessel reversed engines to avoid collision with overtaken vessel, which changed course when overtaking vessel was two ship lengths astern.

5. **Collision** ⚖➟115—Overtaking and overtaken vessels, equally at fault for collision between overtaking vessel and vessel at anchor, should share damages.

Where overtaking vessel and overtaken vessel were equally at fault for collision between overtaking vessel and vessel at anchor, damages should be shared by them.

Appeal from the District Court of the United States for the Southern District of New York.

Libels by the Pan-American Petroleum & Transport Company against the steamship Virginia, her engines, etc., the Texas Steamship Company, Inc., claimant, in which the steamship Spalding, her engines, etc., were impleaded, and by the Texas Steamship Company, Inc., against the steamship S. M. Spalding, her engines, etc., the Pan-American Petroleum & Transport Company, claimant. The steamship Virginia was held solely at fault, and the Texas Steamship Company as owner of the steamship Virginia, appeals. Modified.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell and Paul L. Clugston, both of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Frederic Conger, both of New York City, of counsel), for appellees.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge. On November 20, 1921, a collision occurred between the steamship Virginia proceeding up the Panuco river, Mexico, and the steamship Doheny which lay at anchor in the river. The Spalding at the time was also proceeding up the river, and was overtaken by the Virginia. The navigable channel of the river at the place where the Doheny was anchored was about 1,000 feet. The Doheny was lying from 50 to 150 feet on the right-hand bank with her bow upstream. On the opposite bank there was a pier referred to as the machine shop dock, distant about 700 feet between it and the Doheny. The Spalding and the Virginia had come in from sea and were proceeding light up the river—the former bound for Huasteca terminal docks or an anchorage; the latter for the Texas Company docks about two miles further up the river. The Spalding crossed the bar at the mouth of the river first and proceeded ahead of the Virginia. She dropped anchor on two occasions on her way up to assist her maneuvering past some anchored vessels. She had slowed her engines when two miles below the Huasteca dock, and was proceeding at about two miles an hour when the Virginia was about a mile astern of her proceeding up the river and gradually overtook the Spalding. When the overtaking vessel was about one and a half miles below the Huasteca dock, she blew a signal of one whistle to the Spalding, then about 2,000 feet ahead off the port bow. The Spalding made no reply. The Virginia slowed her engines and within two or three minutes blew a second one-whistle signal, which was not answered by the Spalding. At the time, the latter was about 1,200 feet ahead, and was proceeding about 200 feet off the port bank. At the time there was ample room for the Virginia to pass between the Spalding and the Do-

heny. The Virginia blew a third one-whistle signal and stopped her engines. The Spalding was still headed parallel with the bank on the port side of the channel. The Spalding replied with an alarm signal of four blasts. She was then altering her course sharply to starboard and swinging across the bow of the Virginia toward the starboard bank. At the time the Spalding was about one and a half or two ship lengths ahead of the Virginia. The Virginia reversed her engines full speed and dropped anchor. At the time, the Virginia had reached a position about two or three hundred feet from the Doheny's port quarter. She succeeded in avoiding collision with the Spalding, but, in reversing her engines, she threw her bow to the starboard and came into collision with the Doheny. The navigator of the Spalding admitted that he heard the Virginia blow a one-whistle signal but nevertheless changed the course of the Spalding to the starboard across the course of the Virginia, and did not sound a signal until after the course had been changed, and, indeed, not until the collision between the Virginia and either the Spalding or the Doheny seemed inevitable.

[1, 2] We agree with the District Court that the Virginia was at fault in part for the collision. Her speed was excessive under the circumstances, and, as an overtaking vessel, she failed to keep out of the way. The Spalding was averaging about three miles an hour between quarantine and the place of collision. The speed of the Virginia was about 9 miles. By putting her engines full speed astern, she was unable to avoid collision with the anchored vessel, then about 500 feet off, and it is apparent that she was either proceeding at excessive speed or failed to slacken, stop, or reverse until it was too late. In either case it was negligent navigation. The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; The John H. Starin (C. C. A.) 162 F. 146; American S. S. Co. v. American Steel Barge Co. (C. C. A.) 129 F. 65. It also appears that, when the pilot gave the order to reverse, the third officer was sent forward from the bridge to the forecastle head to let go the anchor, and, when he did so, he let go the wrong anchor. As the emergency arose, the chief officer of the Virginia, whose position was on the forecastle head, was not there. He was at supper. It became necessary for the third officer, who was then on the bridge, to run down flights of stairs from the bridge and forward to the forecastle head, and drop anchor. This he did, but dropped the starboard instead of

the port anchor, thereby pulling her so that she sheered directly toward the Doheny. It was a fault to proceed in these congested waters without an officer standing in a position to let go the anchors. The Sunnyside (C. C. A.) 251 F. 271; The M. E. Luckenbach (D. C.) 200 F. 630.

[3] It is not denied that the Virginia was overtaking the Spalding. It appears that her pilot was attempting to obtain assent to pass by whistle signal. Under article 24 of the International Rules (33 USCA § 109; Comp. St. § 7863), it is provided, "notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel." Navigation Laws of the United States 1927, p. 255. The Inland Rules contain a provision that "the vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel." Navigation Laws 1927, p. 264 (33 USCA § 203; Comp. St. § 7892). Article 18, Rule 8, of the Inland Rules (33 USCA § 203; Comp. St. § 7892) provides that an overtaking vessel desiring to pass on the right or starboard hand of the vessel ahead "shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall put her helm to port." Article 18, Rule 8. But article 28 of the International Rules (33 USCA § 113; Comp. St. § 7867) provides that one short blast means "I am directing my course to starboard." These signals, however, did not change the duties of the respective vessels. If the signal indicated merely the helm under which the Virginia was or should have been operated, still it was the duty of the Virginia to keep out of the way of the overtaken vessel, and she may not be relieved by impressions or reckonings which her officers indulged in that the Spalding was bound for the Huasteca docks instead of an anchorage on the opposite side of the river. Navigation rules must be followed, and it is no excuse for a master or pilot to assume to act otherwise. The Lexington (C. C. A.) 275 F. 279; The Kingston (D. C.) 173 F. 992; Stortind (D. C.) 264 F. 1013. Under the Inland Rules, the overtaking vessel is at fault for failing to keep out of the way of the overtaken vessel. The M. J. Rudolph (C. C. A.) 292 F. 740. Of course, she need not assume the obligation of anticipating improper navigation on the part of the other vessel. The Pleiades (C. C. A.) 9 F.(2d) 804. If the Virginia's one-blast signal merely indicated a desire to pass as her pilot claimed, there was no assent to it and it would avail him

nothing. City of Baltimore (C. C. A.) 282 F. 490.

[4] The Spalding was likewise at fault. They saw the Virginia overtaking them two miles below the place of collision. It was the duty of the Spalding to keep her course, but, after hearing the Virginia, she altered her course to starboard and crossed the river at a time when the Virginia was so close astern that it was necessary for the Virginia to reverse full speed in order to avoid collision with her. At the time the second one-whistle signal was blown, the Spalding was but 200 feet off the bank on the port side of the river, and there was about 500 feet between the Spalding and the anchored Doheny. It is admitted that the Spalding changed her course across the Virginia's bow. She did not begin to swing across the river until her bridge was clear of the bow of the Doheny and while passing the Doheny, the Spalding was headed slightly to her port toward the docks. She intended to anchor ahead of the Doheny, and her turn is described by the captain as "just ordinarily sharp." But, before making the turn, the captain knew that the Virginia was intending to pass on his starboard side, and the pilot admitted that he changed his course after the last signal was blown by the Virginia, but said he heard only one signal which was the last one blown by the Virginia, at which time the latter was one and a half or two lengths astern of the Spalding. From this we conclude that the Spalding changed her course to starboard from a position off the port bank at a time when the Virginia was about two ship lengths astern of her. This was such crowding of the Virginia as to amount to faulty navigation. It appears that, after altering her course, the Spalding did not maintain her course nor her speed as required by the rules. She is responsible for this failure. The Adriatic, 107 U. S. 312, 2 S. Ct. 355, 27 L. Ed. 754; Yang-Tsze Ins. Ass'n v. Furness, Withy & Co. (C. C. A.) 215 F. 859; The Wm. E. Gladwish (C. C. A.) 206 F. 901; The Geo. Dumois (C. C. A.) 153 F. 833. Even though the overtaking vessel insists upon passing without assent from the overtaken vessel, the latter will be held at fault if, after danger of collision, it becomes apparent that it could have prevented it by timely maneuvers on her part. If the overtaken vessel changes her course under such circumstances, she will be held. The Albert Dumois, 177 U. S. 240, 253, 20 S. Ct. 595, 44 L. Ed. 751; The New York, 175 U. S. 187, 205, 20 S. Ct. 67, 44 L. Ed. 126; The Mary C. Elphicke (C. C. A.) 123 F. 405.

25 F.(2d)—40

[5] The pilot was in sole charge of the navigation of the Spalding. The officers of the Spalding saw the Virginia astern a considerable distance and also heard the Virginia's whistle. No report was made to the pilot of the presence of the Virginia. The third officer on the bridge testified that, although he saw the Virginia, he made no report to the pilot, nor did the second officer, who was standing on the stern of the Spalding, report that a vessel was following, and the pilot did not know the Virginia was overtaking him until he heard the third whistle, when the Virginia was but two ship lengths astern. If informed of the near presence of the Virginia, it is fair to assume that the pilot would have remained on the port side of the river where the Virginia had ample room to pass. If the Spalding was keeping her course and speed, it may not have been necessary to keep a lookout astern, but, knowing that it was necessary for her to cross the river for anchorage, she was at fault for not being advised of approaching vessels before her maneuver across. The Illinois, 103 U. S. 298, 26 L. Ed. 562; Boston Sand & Gravel Co. v. United States (C. C. A.) 7 F.(2d) 278; Kennedy v. Sarmatian (C. C.) 2 F. 911, 916. For these faults, the Spalding should have been held with the Virginia responsible for the collision. Both the vessels are equally at fault, and the damages should be shared by them.

Decree modified accordingly.