**THE HAROLD L.**

**THE PERTH AMBOY NO. 2.**

No. 12311.

District Court, E. D. New York.

Jan. 18, 1932.

610

Purdy & Purdy, of New York City (John E. Purdy, of New York City, of counsel), for libellant.

Park, Lynch & Hagen, of New York City (Charles W. Hagen, of New York City, of counsel), for claimant.

Foley & Martin, of New York City, for respondent impleaded.

BYERS, District Judge.

On December 5, 1930, at about 2:00 a. m., the libellant's barge Harold L. was the port vessel, in the third tier, of a five-tier tow, consisting of fifteen light barges (sides 8 to 10 feet) in tow of the tug Perth Amboy No. 2, bound westerly through the Kills. At a point substantially in mid-channel, about 900 feet southwest of the Bergen Point light, a dredge lay at anchor, with a sand-dumper alongside. The dredge displayed riding light; the night was clear, and visibility was good.

The tow proceeded past the Bayonne Bridge, with a helper tug, Viatic, on the starboard side, to prevent contact by the rear boats with the bridge abutment; after clearing the latter, the Viatic changed around to the port side, next the last tier. The captain of this tug testified that he made this change because he saw that "the tow was going to hit the digger."

The captain of the Perth Amboy No. 2 said that, after leaving the Bayonne Bridge, the dredge was slightly off his starboard side, and he steered a course to pass the latter to his own port, heading north of Shooters Island.

Through the Kills, the tide was under foot, running 1.6 miles per hour, and a light wind was blowing from the northeast, which would take effect on the starboard side of the tow, as it veered to starboard.

The decision to keep to the starboard hand in passing the dredge, according to his testimony, was due to the captain's belief that he could accomplish his purpose in this way; also he says a McAllister tow was approaching the dredge, from the west, in the south channel.

Incidentally, no witness was called from any McAllister tow.

This tow being in the course indicated, the tug passed 300 feet, according to the captain—the deckhand says 150 feet—north of the dredge, and the third tier of the tow struck the dredge or the dumper, inflicting the damage to the Harold L. which resulted in the filing of the libel. The helper tug, Viatic, having sensed the danger of such a happening, held to the port side of the tow as long as possible, seeking to prevent the contact, but, as it neared the dredge, had to let go in order itself to clear the obstruction. When the contact was seen to be inevitable, the Viatic blew an alarm, which seems to have been the only whistle signal sounded during the happening here involved.

This tow was about 800 feet long, and, under the conditions of tide and wind which have been shown, the course of the tug, in seeking to pass to the northerly side of the dredge, called for the exercise of great care and nice calculation, to avoid contact with the dredge.

The altering of the course, at a point west of the bridge when the dredge was slightly to starboard ahead, caused the tug to turn to starboard, and the tail of the tow to sheer to port; such was the effect of the tug's action, aided by the wind and tide. That result should have been foreseen by the Perth Amboy No. 2, as it was by the helper. Nor was the choice shown to have been necessary. The starboard hand rule did not require it, because, under these circumstances, whether it was "practicable" was open to serious question.

The reason being that, in handling a tow of five tiers of three barges each, at the end of six fathoms of hawser, a course should have been chosen which would surely carry the tow clear of the dredge, having in mind the wind and tide. The captain of the Perth Amboy No. 2 says he was influenced to make this change in his course, partly because of the oncoming McAllister tow south of the dredge, but, in the absence of clear evidence on that subject, the fact cannot be deemed to have been established.

Nor is it thought that there is an incongruity in holding that the Perth Amboy No. 2 was at fault even though adhering to the narrow channel rule and holding to the starboard side of the channel; such a rule is not a substitute for the exercise of common sense. The George S. Tice (C. C. A.) 287 F. 127. No requirement of holding to the starboard channel to avoid collision with an oncoming vessel or tow has been established by the proof.

In order to evade the presumptive liability attaching to the navigation of the tug, its owner has impleaded under the Fifty-Sixth Admiralty Rule, the respondent, Newark & New York Towboat Company, in a petition which alleges that two of its tugs, each loaded with a tow, were proceeding westward through the Kills on the Staten Island side of the channel; and that, shortly before 3:00 a. m. on the day in question, one of the respondent's tugs, with a tow of sand scows, which had been proceeding as stated, sounded a signal of two blasts, and suddenly turned to starboard in an endeavor to cross the bow of the Perth Amboy No. 2 while the latter was passing between Bergen Point light and the dredge, to which reference has been made. That, in order to avoid collision with the respondent's tow, the Perth Amboy No. 2 slowed her engines to steerageway, and steered to port to pass under the stern of the respondent's tow, with the result that the claimant's tow scraped the sand-dumper alongside the dredge.

The allegations in this petition have not been sustained by the proof.

The claimant has not identified a tug of the respondent with a tow, in a position to accomplish the result described in the petition.

Had the respondent's tow been in such a position, it is difficult to see how it could have avoided the alleged oncoming McAllister tow referred to in the testimony of the captain of the Perth Amboy No. 2. In any case, if such a tow had been in the vicinity, it is thought that some of its crew would have been called as witnesses for the claimant.

The captain of the Perth Amboy No. 2 said that such a crossing tug blew a two-signal whistle, but that he did not answer with any signal whatever. Moreover he said he could not identify that tug.

The only testimony to connect the respondent's tug Passaic with the crossing is that her whistle was so distinctive that it could be recognized. For the sake of argument, it will be assumed that the identity of the Passaic has been shown, but it does not follow that she was at fault. Her course, in going to starboard after passing south of the dredge was reasonably to be anticipated, if she were bound up Newark bay. The captain of the Perth Amboy No. 2 so testified. He saw such a tow well ahead (i. e. at least half a mile) when he passed under the Bayonne Bridge, and, had he followed in its wake, no barge in his own tow would have come into contact with the dredge, or its dumper.

If he chose to put his tow into the position of being affected by that which the leading tow was likely to attempt, it does not seem that he could hope to avoid the duties of an overtaking vessel.

■■ On reargument rendered necessary by a mistake on the part of the court concerning the destination of the Perth Amboy No. 2, it was urged that she was not an overtaking vessel, because she had changed her course after following the tow thought to be in charge of the Passaic, by changing to the channel which would carry her north of Shooters Island, thereby ceasing to be an overtaking vessel; that in her new course she was at liberty to proceed without reference to the first tow, and that, if the latter chose to alter her own course in order to enter Newark bay, she assumed the burdens of a crossing vessel, having the Perth Amboy No. 2 on her starboard hand, and was required to navigate accordingly.

This suggestion is thought not to have originated in the pilot house of the Perth Amboy No. 2, for no alarm was sounded from the latter as a protest against what is now said to have been faulty navigation of an alleged crossing vessel.

The truth is, that the point at which the turn to starboard was made east of the dredge has not been shown. Passing the latter, the Perth Amboy No. 2, by her captain's account, was parallel to the dredge, as was the tow complained of, the latter being some 300 feet or more ahead. The Government Chart No. 285, Amboy Ex. 2, does not indicate two channels in these waters, the one north and the other south, as of March, 1930, and that is the latest chart in evidence.

The claimant's tug had been tailing the other tow for a mile or more, and the turn of the latter into Newark Bay, so far from being an unexpected thing, was sufficiently conventional in these waters to cast upon a following vessel the burden of precaution. It was not in itself improper navigation as in Long Island Railroad Co. v. Killien (C. C. A.) 67 F. 365, or the Pleiades (C. C. A.) 9 F.(2d) 804.

It is thought that the Perth Amboy No. 2 was an overtaking vessel so long as she was tailing the other tow, and traveling faster; that she could not avoid the duties of that relation by doing in advance what she would ultimately have to do if she did overtake the tow ahead and intended to pass, namely, turning to starboard in a parallel or nearly parallel course. There is nothing to show that the leading tow was aware of the prox-

imity astern of the Perth Amboy No. 2 and her tow, while the evidence of the converse is undisputed.

The following cases present so clearly the rights and duties of vessels similarly circumstanced, that it is thought that further discussion of this aspect of the case would be superfluous: The Holly Park (C. C. A.) 39 F.(2d) 572; The Industry (C. C. A.) 29 F.(2d) 29; The Virginia (C. C. A.) 25 F. (2d) 623 (faulty navigation by overtaken vessel, after knowledge shown of proximity of the one overtaking); The M. J. Rudolph (C. C. A.) 292 F. 740.

Consideration of the testimony and the careful briefs submitted by all counsel yields the belief that the only whistle sounded was the alarm signal of the Viatic; that, upon hearing this, the Perth Amboy No. 2 slowed at once, causing her tow to sweep down upon the dredge or the dumper, and thus to collide with it; that the attempt to lay blame upon the unidentified tug and tow ahead, which took the course up Newark Bay which was reasonably to be anticipated, was resorted to as an expedient to explain negligent conduct on the part of the Perth Amboy No. 2; that the expedient has not been successful, and the tug is found to have been negligent in handling its tow.

The libellant has sustained his burden of proof, and is entitled to a decree, with costs; the claimant has failed to sustain his burden of proof, and the respondent is entitled to a dismissal of the petition with costs.

If findings are desired, they may be settled on notice, and should include appropriate reference to ownership, residence and incorporation.