## THE PILAR DE LARRINAGA.

## UNITED FRUIT S. S. CORPORATION v. THE PILAR DE LARRINAGA.

### No. 101 of 1940.

District Court, E. D. Pennsylvania.
Jan. 12, 1942.

Shields, Clark, Brown & McCown, by Samuel B. Fortenbaugh, Jr., all of Philadelphia, Pa., for plaintiff.

Rawle & Henderson, by Joseph Henderson and Thomas F. Mount, all of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

These are cross libels in admiralty, tried before me without a jury. The cause of action is a collision between the vessels S.S. Pastores and S.S. Pilar. United Fruit Steamship Corporation, owner of the Pastores, first filed its libel in rem in admiralty

against the Pilar. Thereafter Larrinaga Steamship Company, Ltd., owner of the Pilar, filed claim to that vessel, answered the libel and filed its own cross libel against the Pastores. Subsequently, United Fruit Steamship Corporation filed an answer to the cross libel.

Included in the records of the case are depositions of the crew of the Pilar.

The collision occurred on December 21, 1940, in the lower Delaware Bay, about six miles north of Overfalls Lightship. The time was about 8:15 P.M. Both vessels were bound up the bay for Philadelphia.

Wind, tide, sea, weather, visibility, other traffic were not factors. The channel, at the point of collision, is wide and deep, and narrowness of the channel with subsequent limitation upon maneuver was also not a factor; nor was shallow water.

Both vessels were damaged in the collision. Each claims that the other was entirely and exclusively at fault, and seeks recovery accordingly.

The wind was light, the sea was smooth, the tide at ebb, near slack, visibility good. Both vessels carried required navigation lights, but the Pilar, a blackout ship, had her ports painted and boarded so that there was no light to walk the decks. The decks of the Pastores were well lit. Shrapnel barriers, erected on the bridge of the Pilar outside both doors of the wheelhouse, cut off the view to port or starboard from the wheelhouse.

At the impact the starboard side of the Pilar near the bow was in collision with the port side of the Pastores at a point 203 feet from her stern.

The Pastores is a twin-screw steamship: Length, 487 feet; breadth, 55 feet; mean draft at time of collision, about 19 feet.

The Pilar is a single-screw steamship: Length, 460 feet; breadth, 58 feet; mean draft at time of collision, about 12 feet.

Both vessels had picked up pilots at the Overfalls Lightship. The Pilar then proceeded up the bay towards Philadelphia at a speed of between 8½ to 9 knots. Ten minutes later the Pastores, having picked up its pilot, followed the Pilar up the bay at a speed of between 13 and 13½ knots. Each was aware of the presence of the other at the time of picking up the pilots. The vessels followed approximately parallel courses until just before the collision. The Pastores followed the Pilar.

From the testimony, I adopt and find the following version of the events leading up to and including the collision:

The Pastores was a faster boat than the Pilar. She gradually overtook the Pilar, until a time arrived when the Pastores, on an approximately parallel course with the Pilar (340 deg. true), was 500 feet astern and from 200 to 400 feet to starboard of the Pilar—at which time the Pastores had the Pilar between 4 and 5 points on her port bow.

Joseph, pilot on the Pastores, estimated a lateral distance between the vessels at that time at something between 200 and 250 feet. Dye, third mate on the Pastores and on watch at the time of the collision, estimates the lateral distance between the two vessels as the bow of the Pastores commenced to come up to the stern of the Pilar at between 400 and 500 feet. Trapero, able-bodied seaman and lookout on the Pastores at the time of the collision, estimates the distance at that time at between 400 and 500 feet. No witness for the Pilar except the lookout Longdon testified as to the distance at that or any other time (or, for all that appears, ever saw the Pastores after the vessels left the Overfalls Lightship); and the Pilar lookout Longdon estimated the distance at the time the Pastores was lapping the stern of the Pilar at 40 feet.

Because of improbability and weight of evidence, I reject Longdon's story in this regard: As between the stories of those aboard the Pastores, I am most inclined to accept that of the pilot Joseph—first, because while not altogether disinterested, he is still less interested a witness than the regular officers or crew of the Pastores; and second, because since he was in charge of navigation he would be the one most apt to concentrate on the distance in an overtaking maneuver.

I therefore conclude that the distance between the vessels at about the time the bow of the Pastores caught up to the stern of the Pilar was about 250 feet. I also find that thereafter and until the time when the Pilar first made a right swing, as hereinafter described, the vessels were on very close to parallel courses—within a degree or less; wherefore, the distance between them remained approximately the same until the Pilar commenced a right swing.

When the Pastores was still 500 feet astern of the Pilar, the former's pilot ordered a change of course to 342 deg. true,

and that course was maintained until the vessels were approximately abeam.

At that time the Pilar commenced a rapid right swing—toward the Pastores. As soon as this maneuver was noticed by the Pastores, her pilot Joseph ordered the rudder right and, immediately thereafter, hard right. The collision was not averted; the Pilar continued her right swing and struck the Pastores at the point already mentioned. The collision took place at 8:15 P.M., as established by the testimony (both the oral testimony of witnesses for the Pastores and mute testimony of the course recorder of the Pastores, coupled with Commander Creasap's reconciliation of course recorder time and Pastores' clock time). The time which elapsed between the beginning of the Pilar's right swing and the collision was from a minute to a minute and a half.

At no time did either ship blow a whistle. Both ships maintained full speed until subsequent to the collision.

After the collision the Pastores circled around to the left, exchanged names with the Pilar and information concerning the damage. The Pastores took bearings to determine the place of the collision. This was rendered possible because the anchor of the Pilar had run out due to the collision, so that the point of the contact could be determined and the bearings taken.

There is no testimony anywhere to explain the reason for the right swing. The Pilar's pilot died from natural causes about three months after the collision. No officer or member of the crew of the Pilar attempted to give a reason for the Pilar's sudden right swing. The pilot Rowland never gave any reason for it. The testimony shows he had simply given two successive orders to the wheelman to go to starboard, following which the vessels collided. Counsel for the Pilar contend that the right swing was a proper maneuver because at some time during the voyage from Overfalls Lightship to Brandywine Light a deviation to the right in the course of the Pilar would be proper; but no one testified that that was done at the proper or necessary time or place. I can not accept what amounts merely to a supposition, and a vague and remote one at that, in the place of a reason which should be furnished by testimony if such a reason existed.

It may be mentioned at this point that the testimony shows that just prior to the collision, the Pilar's pilot gave the order to port the helm, but this came too late to have any effect on the Pilar's heading, and the Pilar continued her right swing until the collision.

At some time during the course of these proceedings, it was contended on behalf of the Pilar that the Pastores had attempted by a left swing to cross the bows of the Pilar, thus causing the collision; this contention, however, is not only unsupported by the testimony, but was entirely negatived by the course recorder of the Pastores (the Pilar was not equipped with a course recorder).

The Pastores' course recorder (perhaps more accurately called a heading recorder) entirely substantiates the story of the Pastores' pilot—that the Pastores had maintained a course of about 340 deg. true until about 500 feet astern of the Pilar; that she then changed to and maintained a course of about 342 deg. true until a minute or a minute and a half before the collision, or until the commencement of the starboard swing by the Pilar.

At the time of the collision the Pilar, instead of being headed 340 deg. true—a course which would have brought her to her destination at Brandywine Light—was headed north northeast, a difference of about three points or over 33 deg., and a course which, if it had been maintained, would have landed her on the Jersey beach.

The following were on the deck of the Pilar when she commenced her right swing and up to the time of the collision:

a. Jennings, helmsman.

b. Dance, the third mate on watch.

c. Shore, chief engineer (who came on deck after the swing started and just before the collision).

d. Longdon, able-bodied seaman and lookout.

e. Rowland, the pilot.

Those on the deck of the Pastores:

a. Dye, third mate on watch.

b. Eilertsen, able-bodied seaman and helmsman.

c. Trapero, able-bodied seaman and forecastle lookout.

d. Joseph, the pilot.

The distance between the vessels at the time the Pilar commenced her starboard swing is of importance. I have already indicated my finding on that score, but I should also mention this:

Counsel for the Pilar has attempted to show (by means of a trigonometric calcu-

lation) that the distance at that time was about 65 feet. This calculation was based on (a) the fact that the green starboard light of the Pilar shines forward and two points abaft the beam, and (b) the statement by the Pastores' pilot Joseph that the bridges of the two vessels were about abeam or a little less when he, Joseph, first saw the green starboard light of the Pilar.

Mr. Morse, a marine engineer and naval architect, witness for the Pastores, drew a diagram based on certain assumptions supported by testimony of other witnesses for the Pastores, and also based on the course recorder, which diagram purports to show that the two vessels must have been about 390 feet apart when the Pilar commenced her right swing.

I do not discuss these diagrams, their implications, or their scientific accuracy, in any detail. Inherent in these diagrams, or the deductions to be drawn therefrom, are errors of observation involved in the assumptions upon which the diagrams are predicated. These errors are susceptible of such magnification by the process involved in the construction of the diagrams that the inferences deducible therefrom are robbed of their value. An error of one or two degrees in observation may mean an error of 100 feet at some point in the drawing of which the diagram consists. There is no testimony as to what an error of one or two degrees, or 50 to 100 feet in distance, or 30 or 40 seconds in time, might mean when translated into distance between the ships at a particular time by means of a diagram.

Fallible as the perceptions of mortals may be under the stress of sudden peril, nevertheless the recollections of these sensory perceptions are the safest guide in a judicial determination of the factors indicating fault on one side or the other—at least in the absence of some scientific demonstration less susceptible to nonnegligible margins of error than exist in the case at bar.

The record discloses that the least estimate of the angle between the vessels at the time of collision was 32 deg. I do not think that if the vessels had only been 40 or 65 feet apart at the time they were pursuing parallel courses practically abeam of each other just prior to the starboard swing of the Pilar, that the angle of collision would have reached 32 deg.; nor that the bow of the Pilar would have swung through an arc of three points, travelling at 8 or 8½ knots an hour, without striking the other vessel much more quickly than the Pilar struck the Pastores.

An important question arises here: Who, if anybody, on the Pilar, was aware of the presence of the Pastores to starboard of the Pilar between the time the Pastores commenced to lap the other vessel's stern and the time of the collision?

It is apparent that only the Pilar's lookout, Longdon, was aware of this vital fact. Those aboard the Pilar might have known, from seeing the Pastores taking on a pilot at the Overfalls Lightship, that the Pastores was following the Pilar up the Delaware Bay, but I will not for that reason fix upon them the knowledge of the Pastores' whereabouts at the time of—or just prior to—the collision.

The lookout did testify that he "sung" out the fact of the Pastores' approach, although he did not use the speaking tube which would have magnified his voice. He does not know whether anyone heard him. There is no testimony by those aboard the Pilar that he was heard. I conclude that he was not. Nobody answered him when he sung out. The warning was not repeated.

It is also true that there was testimony that the pilot Rowland at some time or other was in a position on the bridge whence he could have seen the Pastores had he looked. I conclude that he did not see the Pastores. There was no positive testimony that he did see her. It is difficult to imagine that he would have ordered a starboard maneuver at the time he did had he known where the Pastores then was.

Therefore, I find that the only one aboard the Pilar who knew of the Pastores' whereabouts at the time the Pilar commenced her right swing was the lookout Longdon.

I am quite satisfied, apart from everything else, that Rowland was an incompetent pilot. He was old and sick and the illness from which he was suffering at the time of the collision, developing progressively, caused his death three months later. He was not sufficiently mentally alert to carry out his duties. He was confused as to details of the navigation later on in the evening, and the Master of the Pilar later wired for another pilot. His orders were not clearly given or clearly understood at times, so that the third mate found it necessary to neglect a lookout in order to remain in the wheelhouse to transmit orders

to the wheelman when necessary. Rowland's testimony before the inspectors was pitiably confused.

■ No matter what the Pastores did or did not do, the act of those in charge of navigation aboard the Pilar in causing her to execute her right swing when the Pastores was abeam or nearly abeam, and about 200 to 250 feet away to starboard, was a negligent act which contributed to the happening of the accident.

I say this with the full realization that this was an overtaking situation, where the Pastores was the overtaking and burdened ship and the Pilar was the overtaken and privileged ship, and that the Pastores at no time blew the whistle as required by the Inland Rules.

The Pilar, proceeding on practically a parallel course with the Pastores, the two ships abeam or nearly abeam separated by about 250 feet, swung three points off her course on a clear night, with good visibility, and in the absence of any tide, weather, or water factor. The Pastores was well lit. No sensible reason or excuse appears for this right swing of the Pilar. The swing took her considerably off her course and rendered a collision inevitable. It is clear that the Pilar was negligent in a way that contributed to the happening of the accident.

■ It is unquestioned that the Inland Rules of Navigation, Title 33 U.S.C.A. § 201 et seq., apply in this case.

Rule VIII, Article 18, of the Inland Rules, supra, section 203, provides:

"§ 203. Steam vessels approaching, meeting, or passing one another; banks obstructing view; leaving dock. Art. 18.

\* \* \* \* \* \* \*

"Rule VIII. When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall put her helm to port; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall put her helm to starboard; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals.

"The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel."

This Rule requires (1) an overtaking vessel to signal her intention to pass and forbids her to pass before obtaining the assent of the overtaken vessel; and (2) prohibits the overtaken vessel from attempting to cross the bow or crowd upon the course of the passing vessel.

Two other Inland Rules are applicable to the issues presented by this litigation.

Article 24 (section 209, supra) provides:

"§ 209. Overtaking vessel to keep out of the way; definition of 'overtaking vessel.' Art. 24. Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel.

"Every vessel coming up with another vessel from any direction more than two points abaft her beam, that is, in such a position with reference to the vessel which she is overtaking that at night she would be unable to see either of that vessel's side lights, shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

"As by day the overtaking vessel can not always know with certainty whether she is forward of or abaft this direction from the other vessel she should, if in doubt, assume that she is an overtaking vessel and keep out of the way. (June 7, 1897, c. 4, § 1, 30 Stat. 101.)."

This Rule puts the burden upon the overtaking vessel to keep out of the way until she is "past and clear".

Article 29 (section 221, supra) provides:
"§ 221. Usual additional precautions required generally. Art 29. Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep

a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case. (June 7, 1897, c. 4, § 1, 30 Stat. 102.)."

This Rule makes it incumbent upon all vessels "to keep a proper lookout" and to take "any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case".

In the instant case we have a situation where a collision occurred between an overtaking vessel and an overtaken vessel, and their rights and liabilities are to be determined by the application of the Inland Rules above quoted.

Briefly stated, the Pastores' contention is that although she was the burdened vessel, obliged to sound a whistle before attempting to pass or passing, her breach of duty in not sounding a warning was not the cause of the collision, but that it was due solely to the negligent navigation of the Pilar under the circumstances.

The Pilar's contention is twofold: (1) That her navigation or operation, to wit, the admitted swing to starboard, was not a negligent act; and (2) that the Pastores' violation of Rule VIII, Article 18 (failure to sound a signal and to obtain the assent of the Pilar before attempting to pass), and of Article 24 (in that she failed to "keep out of the way of the overtaken vessel"), made the Pastores guilty of statutory violations and thereby solely liable.

■ I have already stated that it is clear that the Pilar was negligent in a way that contributed to the happening of the accident. She is not absolved from that negligence by the statutory privilege accorded to her as the overtaken vessel by Rule VIII, Article 18. It is manifest that the Pilar violated Article 29 in that she failed "to keep a proper lookout" and to exercise the "precaution * * * required by the ordinary practice of seamen, or by the special circumstances of the case".

If the Pilar had kept a proper lookout, those in charge of navigation of the Pilar would have seen or been apprised of the whereabouts of the Pastores when the Pilar commenced her right swing. The Pilar was guilty of neglect of a precaution required both by the ordinary practice of seamen and by the special circumstances of the case, in that she swung towards the Pastores when she knew or should have known where the Pastores was, and knew

or should have known that the swing would cause a collision. In thus violating the rule she was guilty not only of its infraction, but, under the circumstances of negligence contributing to the disaster.

Farwell in "The Rules of the Nautical Road", 1941, in discussing The M. J. Rudolph, 2 Cir., 292 F. 740, where an overtaken vessel was exonerated on the ground that she was not required to look behind before she changed her course, however abruptly, says on page 166: "However, this approval of what under some circumstances would be an improper lookout aft should not be accepted too literally. It really amounts to little more than a refusal to inculpate a vessel which is flagrantly run down by another vessel having no right to overtake her without a signal and still able by smart maneuvering to avoid the collision. It merely says that with respect to a particular offending vessel approaching from more than two points abaft the beam there is no obligation to sight her before hearing her required whistle. *It should not be construed as a blanket provision removing the obligation of a proper lookout astern with eyes as well as ears. On the contrary, it is distinctly poor seamanship to change course or reduce speed materially without first checking the situation all around the compass.*" (Emphasis supplied.)

The Supreme Court has made a similar observation in The Illinois, 103 U.S. 298, 26 L.Ed. 562, where it was said: "While a man stationed at the stern as a lookout is not at all times necessary, no vessel should change her course materially without having first made such an observation in all directions as will enable her to know how what she is about to do will affect others in her immediate vicinity."

In The Industry, 2 Cir., 29 F.2d 29, 30, Judge Learned Hand said: "Suppose that an overtaking vessel, in disregard of her duty, undertakes to pass without giving the necessary signal. Should she get so near that any change of course by the vessel ahead would make it impossible for her to avoid collision, it may be that the vessel ahead must forego her privilege."

■ In speaking of required signals, Judge Hand was, of course, referring to Rule VIII, Article 18. I agree entirely with Judge Hand's statement—that exoneration from liability which attaches to an overtaken vessel by operation of the above rule of navigation (i. e., the duty of the overtaking vessel to signal her con-

templated passing) ceases to operate so as to exculpate the overtaken vessel, once the dangers designed to be prevented by the said rule have ceased to exist.

It is my opinion that the duty of the overtaking vessel to sound a signal is designed only to cover the relative positions of the two vessels up to—but not beyond—the point when the overtaken vessel, relying on no signal having been sounded aft of her, might take a notion to turn either to port or starboard, without taking the trouble to look aft, and by such turn create the risk of collision by crossing the bow of the overtaking vessel.

That protection to the overtaken vessel, and her exoneration from liability in the absence of a signal, ends, however, when the reason for it ceases—that is to say, when the overtaking vessel (not having signalled at all) has reached such a point that the overtaken vessel by keeping a proper lookout both to starboard and port does or should see the overtaking vessel on one side or the other.

To put it differently: The applicable and above mentioned rule of navigation exculpates the overtaken vessel from liability because of a swing to starboard or port, only so long as the situation of the two vessels is such that the overtaking vessel can not be seen by the other without the overtaken vessel keeping a lookout astern.

I say all this with full realization that Article 24 puts the burden upon the overtaking vessel to keep out of the way until she is "past and clear". The Pastores was not "past and clear" in the case at bar. Is the rule to be construed so literally that the mere fact of the collision is to be taken as demonstrating that the Pastores was at fault because she did not literally "keep out of the way" of the Pilar at a time when she, the Pastores, was not past and clear?

I think not. I do not believe that so literal a construction of the rule is called for. The numerous cases in which the overtaking vessel has been exonerated, or the damages divided, demonstrates that "keeping out of the way" of another vessel does not mean keeping out of the way so as to avoid a collision no matter what unlooked for and unreasonable maneuver the overtaken vessel might indulge in: The Virginia, 2 Cir., 25 F.2d 623; Long Island R. R. Co. v. Killien, 2 Cir., 67 F.

365; The Artemis, 2 Cir., 39 F.2d 553; and cases cited in The Industry, supra.

It remains to dispose of the cases relied on by the Pilar.

The M. E. Luckenbach, D.C., 163 F. 755, is inapplicable. There the court held the overtaking vessel guilty of close shaving. I do not find close shaving in the case at bar.

The George W. Elder, D.C., 203 F. 523, is likewise inapplicable on the facts. There the overtaking vessel practically ran into the vessel ahead—after receiving a danger signal.

In Gring v. Boyer, 3 Cir., 157 F. 220, the vessels were going in opposite directions and that case is not helpful here.

In The Merrill C. Hart, 2 Cir., 188 F. 49, divided damages were allowed—hence the case can only be utilized by the Pilar for the language, concerning the propriety of which there is no doubt, but its applicability is another matter.

The North Star, D.C., 132 F. 145, is a suction case, and the opinion shows that the court considered that the suction caused by the close shaving of the overtaking vessel was the substantial factor in the case. Counsel for the Pilar has argued at one point in his brief that suction caused this collision: but because of the depth of the channel at the point of the collision, and the absence of any testimony either by crew or experts that suction had anything to do with the collision, I repudiate it as a causal factor herein.

The Osceola, D.C., 30 F. 383, is very sketchily reported. Close shaving again seemed to be a factor. The opinion hardly contains sufficient elaboration upon the circumstances for any great utilization as precedent.

The Industry, supra, has already been discussed.

The M. J. Rudolph, 2 Cir., 292 F. 740, is the strongest case relied on by the Pilar. There the privileged vessel cut across the bow of the steamer, 200 feet to starboard, which was overtaking the vessel ahead, just about passing the latter's stern, without giving a signal. The burdened vessel was held solely liable. The court said: "An overtaken vessel, receiving no signal from the overtaking vessel, is not required to look behind her before she changes her course, however abruptly. * * * If an overtaking vessel, without signal, comes so close to the overtaken vessel that a sud-

den change of course by the latter may bring about a collision, the fault is that of the overtaking vessel."

The principles enunciated in the M. J. Rudolph, however, do not exculpate the Pilar, since it is evident that in The M. J. Rudolph the burdened vessel had not nearly come abeam of the privileged vessel, and that in order for the latter to see the former the overtaken vessel would have had to look behind her. This, she is not required to do. I have already indicated sufficiently, however, that so far as regards the liability of the privileged ship, the rule is different when she executes a bad maneuver at or after the time the burdened vessel is abeam of her. That the two vessels were "practically abeam" before the Pilar commenced her right swing is admitted by the Pilar's counsel in his brief.

So much for the discussion of the cases relied on by the Pilar. Other cases cited are not in point and require no analysis.

I come now to the consideration of the question of liability on the part of the Pastores.

I find that the Pastores was negligent in a way that contributed to the happening of the accident. Her negligence consisted of (1) the failure to blow the whistle signalling her intent to pass the Pilar; and (2) in undertaking to pass before obtaining the consent of the Pilar, in violation of Rule VIII.

I wish to make it clear that I do not convict the Pastores of negligence merely because she violated that rule. I consider that the failure to blow the whistle contributed to the happening of the accident; and the accident would not have happened had the whistle been blown.

Farwell in "The Rules of the Nautical Road" says on page 167: "There is thus effective a requirement so rigid with respect to the overtaking vessel in inland waters that unless she signals and receives permission to pass, the only question usually left the courts to decide after a resulting collision is whether she shall pay all the damages or only half of them."

While I do not necessarily subscribe to so broad an enunciation of a legal principle (it is not necessary on the facts of this case to adopt this statement as such), nevertheless, the statement shows the conclusion of a text book writer upon the subject, and indicates at least that the danger intended to be avoided by the enforced adherence to the rule is so prevalent that the overtaking vessel is certainly at least suspect when she violates the rule.

Referring to the rules, the Supreme Court said in Belden v. Chase, 150 U.S. 674, 698, 14 S.Ct. 264, 271, 37 L.Ed. 1218:

"They are not mere prudential regulations, but binding enactments, obligatory from the time that the necessity for precaution begins, and continuing so long as the means and opportunity to avoid the danger remain. The Dexter [Peters v. The Dexter], [90 U.S. 69,] 23 Wall. 69 [23 L. Ed. 84]. Obviously, they must be rigorously enforced, in order to attain the object for which they were framed, which could not be secured if the masters of vessels were permitted to indulge their discretion in respect of obeying or departing from them. * * *

"* * * And it is the settled rule in this court that, when a vessel has committed a positive breach of statute, she must show, not only that probably her fault did not contribute to the disaster, but that it could not have done so."

Thus a heavy burden is put upon the overtaking vessel should she desire to escape liability when she had admittedly, as in the case at bar, violated the rules—in this case, Rule VIII.

I think the picture in this case may be reduced to very simple terms, thus:

Both the Pilar and the Pastores committed negligent acts: The Pilar by her swing to starboard above described, and the Pastores by her failure to blow the passing signal. And I believe that the collision would not have occurred but for the negligence of both; or, to state it differently, that if either had not committed its negligent act, the collision would have been avoided.

I believe that if the Pastores had whistled, those in charge of navigation aboard the Pilar, including the pilot Rowland, having thus been apprised (as required by the rule) that the Pastores was passing to starboard, would not have executed the starboard maneuver, and no collision would have occurred.

It is perfectly true that the lookout Longdon saw the Pastores coming up on the starboard quarter of, and preparing to pass, the Pilar. But Longdon was not in charge of navigation. He was not at the wheel, and could not—and certainly did not—give or-

ders to the wheel. Therefore, notwithstanding Longdon's knowledge, those in charge of navigation on the Pilar still did not know of the whereabouts of the Pastores.

It may be objected that Longdon's knowledge is imputed to those navigating the Pilar. But imputed knowledge is not, for the purposes of the present discussion, actual knowledge, and—again for the purposes of this discussion—it has not the legal effect of actual knowledge. For I am at this moment occupied in determining whether the Pastores' failure to whistle contributed to the happening of the accident. If she had whistled, those navigating the Pilar would actually have known of her presence and would not, in my belief, have swung the Pilar to starboard, and the collision would not have happened. Any knowledge merely imputed to the navigators would not, and in this case did not, prevent the collision. Actual knowledge would have prevented the collision.

In weighing the problem whether the Pastores must be held for liability for the damages suffered in the collision, I have before me really a stark factual question: Would the accident have happened if the Pastores had not committed the negligent act complained of (failure to blow the whistle)? I believe the answer should be in the negative—I believe the accident would not have happened if the Pastores had blown the whistle; wherefore, I conclude that she was guilty of negligence which contributed to the happening of the accident, and consequently should be held to equal liability with the Pilar, which was likewise guilty of negligence in a way that contributed to the collision, and of negligence but for which the collision would not have occurred.

The Pastores strongly urges that whatever negligence she was guilty of in not blowing the whistle had, so to speak, passed out of the picture by the time the negligent act of the Pilar intervened, wherefore the Pastores claims exculpation, and cites authorities purporting to sustain her position.

I have, however, already indicated my opinion that the negligence of the Pastores was a contributing factor in the collision.

As to the cases relied on by the Pastores:

The Blue Jacket, 144 U.S. 371, 12 S.Ct. 711, 36 L.Ed. 469, is cited for the proposition that an infraction of statutory regulations in the navigation of the vessel does not in itself establish liability. There is no quarrel with that principle, but I have already stated that under the circumstances in this case the infraction was not only an infraction but an act of negligence.

The Illinois, supra, and The Philadelphian, 1 Cir., 61 F. 862, are readily distinguishable on the facts from the case at bar, as clearly demonstrated in The Industry, supra.

The Virginia, supra, might be cited in an argument seeking to hold the Pilar liable, but does not operate to exculpate the Pastores. As a matter of fact, in The Virginia, the damages were divided.

Long Island Railroad Company v. Killien, supra, does not govern. That was simply a case where, unlike the present, the court exonerated the overtaking vessel, apparently on the ground that her negligence did not contribute to the happening of the accident. It was said in that case (67 F. page 367): "Only such vessels can invoke the violation of the statute as an actionable fault as have been prejudiced by it, either because their own movements have been embarrassed by the presence of the offending vessel, or because they have omitted to take some precaution in ignorance of her presence, which they might otherwise have avoided danger by adopting."

The Pleiades, 2 Cir., 9 F.2d 804, merely holds that an overtaking vessel need not anticipate improper navigation on the part of the overtaken vessel. It certainly does not say that a negligent act of the burdened ship contributing to the collision would not render her liable.

The Artemis, supra, is not in point. There the overtaking ship signalled her intention to pass by the proper whistle, and the privileged ship knew of the whereabouts of the other.

The same situation exists in Larsen v. Portland California S.S. Co., 9 Cir., 66 F. 2d 326.

In summary I find:

(1) The Pilar "crowded upon the course of the passing vessel", the Pastores, in violation of Rule VIII; she made an unnecessary, unjustifiable and risky swing to starboard at a time when the Pastores was in such a position that the maneuver was dangerous and negligent, and when the Pastores was in such a position that she either could or should have been seen by the Pilar since the two vessels were then

abeam. The Pilar was therefore negligent in a way that contributed to the happening of the accident.

(2) The Pastores was negligent in that, being the burdened and overtaking vessel, she failed to signal her intention to pass. Had she signalled, those in charge of navigation aboard the Pilar (the pilot, the third mate or both) would have known of her presence to starboard and would not, I think, have executed or permitted to be executed the Pilar's swing to starboard: hence, the negligence of the Pastores contributed to the happening of the accident.

■ (3) Both vessels are liable, each having committed acts of negligence which contributed to the happening of the accident, and the damages should be divided accordingly.

I think the findings of fact and conclusions of law have been sufficiently stated.

If it is desired, requests for findings of fact and conclusions of law may be submitted, together with a decree in proper form, and in conformity with this opinion, with provision for a reference to a special master to find damages, if the parties cannot agree upon the respective amounts.