THE M. E. LUCKENBACH.

THE HUGH KELLY.

(District Court, E. D. New York.   October 22, 1912.)

1. COLLISION (§ 61*)—SAILING VESSEL AND TUG WITH TOWS—INABILITY OF TUG TO HANDLE TOWS.

A tug leaving New York with three heavily loaded coal barges in tow, one of which came into collision with a schooner on a crossing course, which it was the duty of the tug to keep out of the way of, cannot be exonerated from liability, on the ground that she could not handle her tows, having no right to take them out, unless she was able to perform her obligations to other vessels.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. § 61.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

2. COLLISION (§ 61*)—SCHOONER AND TUG WITH TOWS CROSSING—FAULT.

A schooner leaving New York Harbor in the daytime by way of the Swash Channel *held* not in fault for a collision with one of three barges in tow of a tug on hawsers at the intersection of Main Ship Channel, down which the tow was passing; the master having the right, as he did. to act on the supposition that the tug would slow down and pass under the schooner's stern, until it was too late to avoid the tow.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. § 61.*]

3. COLLISION (§ 109*)—DAMAGES—PROXIMATE CAUSE OF INJURY.

A loaded coal barge, which was the second of three in a tow, was cast off by the leading barge, because of a slight collision between such barge and a crossing schooner, to permit the schooner to cross through the tow. The second barge was then signaled by the tug to anchor, and dropped one of her two anchors; but some 15 or 20 minutes afterward she stranded on a shoal three-fourths of a mile from where she was cast off, and was lost with her cargo. The weather was fair, and her two anchors, with sufficient chain, would have held her against the action of the tide and wind. *Held*, that the proximate cause of her injury was the negligence of her master and not the collision; and that the tug which was in fault for the collision, was not liable therefor.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 232; Dec. Dig. § 109.*]

In Admiralty. Suit by William R. Printz, master of the barge William H. Conner, and H. N. Hartwell & Son, Incorporated, owner of her cargo, against the steam tug M. E. Luckenbach (Edgar F. Luckenbach, estate of Lewis Luckenbach, and estate of Edward Luckenbach, claimants) and the schooner Hugh Kelly, impleaded (Elisha H. Weaver, claimant). Libel and petition impleading the Hugh Kelly dismissed.

Peter S. Carter, of New York City, for the William H. Conner.

Convers & Kirlin, of New York City (J. Parker Kirlin, of New York City, of counsel), for H. N. Hartwell & Son, Inc.

Wallace, Butler & Brown, of New York City (James K. Symmers, of New York City, of counsel), for the M. E. Luckenbach.

Carpenter & Park, of New York City (Samuel Park, of New York City, of counsel), for the Hugh Kelly.

VEEDER, District Judge. This action arises out of a collision between the barge A. G. Ropes, in tow of the steam tug M. E. Luckenbach, and the schooner Hugh Kelly, at or near the junction of Main Ship and Swash Channels, shortly after noon on April 22, 1909.

The tug Luckenbach was outward bound in the Main Ship Channel, with the loaded coal barges A. G. Ropes, William H. Conner, and Henry Endicott in tow, in the order named, on hawsers 75 fathoms or more in length. The three-masted schooner Hugh Kelly, outward bound, without cargo, was proceeding down the Swash Channel. The tug and schooner were, in plain sight of each other from a distance of more than a mile and a half apart; but each held its course until they were close together. When the tug had crossed the schooner's course, the latter attempted to avoid collision by swinging off in the line of the course of the tug and tow. The maneuver was unsuc-

cessful. The starboard bow and side of the schooner collided with the port quarter of the first barge, the Ropes, and the schooner's stern swung around toward the hawser, between the Ropes and the second barge, the Conner. Thereupon the master of the Ropes, in order to free his own vessel and to prevent the schooner from sliding down on the hawser into the Conner, cast off the hawser between the Ropes and the Conner. The schooner then passed on between the Ropes and the Conner, and proceeded to sea by way of South Channel. The tug continued on her course through Gedney Channel with the first barge, the Ropes, and anchored her near the mouth of that channel.

When the master of the tug saw that the hawser connecting the first and second barges had been cast off, he signaled the Conner to anchor. The master of the Conner had already discovered that the hawser was in the water, although he says he had not seen it cast off, and was preparing to anchor when the tug signaled. He finally dropped one of his two anchors; but the Conner nevertheless brought up several minutes later on a shoal southeast of the black buoy CB[1] at the turn into Gedney Channel. The third barge, the Endicott, did not anchor, and was still fast to the Conner when the latter went aground. The tug returned at once after anchoring the Ropes, and attempted, without success, to release the stranded barge. Wrecking pumps from the tug were put aboard the Conner; but she filled so rapidly that the pumps were soon disabled. Thereafter, at the rise of the tide on the same day, the tug made another attempt to get the Conner afloat, but could only swing her bow around to the eastward. The barge and her cargo became a total loss, and later on the wreck was removed by the federal authorities. The point at which the wreck was located by the United States engineers, from triangulations taken on April 27th and June 2d, is about 1,000 feet southeast of the point at which the libelants claim that the Conner stranded on April 22d.

The master of the barge, in his own behalf, and in behalf of her owners and the owner of her cargo, libeled the tug Luckenbach for the damages arising from the loss of barge, cargo, and personal effects. The Luckenbach brought the schooner Hugh Kelly in as a party respondent, by petition, under the fifty-ninth admiralty rule. Subsequently the owner of the cargo petitioned to be joined as co-libelant.

The surrounding conditions on the day in question were these: The tide was the strength of the ebb, from one-third to one-half ebb. Its actual strength was estimated by witnesses, who were navigating with reference to it in this locality, as low as 2 and as high as 4 miles an hour. An expert pilot, whose qualifications are unquestioned, testified that its normal strength is 2.1 miles, and that it does not exceed 3.1 miles under abnormal conditions. The set of the tide in this locality when it becomes steady is E. S. E. The wind was from the west, about N. W. It was blowing at the rate of at least 10, but not more than 15, miles an hour. There was a ground swell from the southward.

The schooner was over 200 feet in length, and drew about 9½ feet.

She was proceeding down the Swash Channel substantially on the channel course of S. E. ½ S. Her lower sails were set. The booms were on the port side. Her speed over the bottom is variously estimated; but it is safe to say that at no time after she sighted the tug did she make more than 4½ miles an hour, and the indications are that she was making less as she approached the junction of the Main Ship Channel.

The general course of the Main Ship Channel is E. by N. ⅝ N. The indications are that the tug was heading up somewhat on this course to keep her long tow in the channel. With the prevailing tide and wind the barges would necessarily sag to the southward. The tow was a heavy one, all three barges carrying a full cargo of coal. The first barge, the Ropes, was 257 feet long, 44 feet beam, and drew 26½ feet. The second barge, the Conner, was 210 feet long, 42 feet beam, and drew 24 or 25 feet. The third barge, the Endicott, was less than 200 feet long, 35 feet beam, and drew 16 feet. The Conner's cargo was 2,147 tons. The estimates of the speed of the tug and tow vary. The indications are that her speed was at least equal to, and probably somewhat in excess of, that of the schooner.

The captain of the tug testified that, when the tug and the first barge had crossed the line of the schooner's course, he blew several blasts of his whistle as a signal to the schooner that he intended to keep his course. The schooner, which was then about a quarter of a mile off, thereupon put her wheel to starboard, dropped the peak of her spanker, so that she would answer her helm, and swung off on a course parallel with that of the tug and tow until she got the wind on the end of her boom. In this situation the captain of the schooner practically lost control of his vessel, and the tide carried her into collision with the barge Ropes. When it appeared to the captain of the tug that the schooner's jib boom would go into the mizzen rigging of the barge, he reduced his speed for a few moments, so that the barge would lose way. When the barge sagged off, he increased the tug's speed again, in order to pull the barge clear. It was at or just before this juncture that the master of the Ropes cast off the hawser connecting the first and second barges.

The captain of the schooner testified that he navigated with reference to the expectation that the tug would cross under the schooner's stern. It was not until the tug crossed his course that he had any reason to expect anything else, and then he swung off as described by the captain of the tug. He denies that the tug signaled him at any time before the collision. When the tug crossed his course, he was 400 feet off. His jib boom struck the mizzen rigging of the after mast of the barge, and, since the tug was going ahead at the time, she swung the schooner around, so that her sails swung to starboard.

[1] So far as the collision is concerned, the fault of the tug Luckenbach is clear. It was her duty to keep out of the way of the schooner; and her contention that she was unable, when danger became imminent, to do anything to avoid collision would not, if true, relieve her from responsibility. If, under the existing conditions, the master of the tug could not tow the three barges in such a way as to enable

him to comply with his obligation to keep out of the way of sailing vessels (and such is substantially his testimony), he should not have attempted to take them out. If the barges were taken out at that time, they should have been taken out separately. If the three were taken out at one time, the master should have awaited conditions which would have enabled him to comply with his obligation to other vessels.

[2] Whether the schooner Kelly was also at fault is a question of more difficulty. In its consideration several matters to which reference was made may be eliminated. In the schooner's answer it is alleged that:

"Those in charge of the Kelly's navigation believed that she [the tug] would port her wheel and change the course of her tow to starboard, in order to clear said schooner, or stop her headway and permit the schooner to pass across her hawser, which she could easily have done."

And some of the witnesses testified to the feasibility of the latter maneuver. But the captain of the schooner does not support this allegation. Indeed, he was not even questioned about it. He testified, as already pointed out, that he navigated with reference to the expectation that the tug would cross under the schooner's stern. The issue raised by the conflicting testimony as to whether the tug signaled the schooner prior to the collision is unimportant, in view of the fact that the captain of the tug does not claim to have signaled until after the tug and first barge had crossed the line of the schooner's course, at which time it must have been apparent to the schooner, without such notification, that the tug would not cross under the schooner's stern. Moreover, the criticism of the maneuver finally attempted by the captain of the schooner is not persuasive. Under the conditions prevailing, I do not think that it was feasible for the schooner to luff or to anchor. Her captain adopted the best course available in the emergency; and the only consideration remaining is whether he should have acted earlier.

As a privileged vessel, the schooner was not only entitled, but bound, to maintain her course as long as it was possible for the burdened vessel to avoid her, at least in the absence of some distinct indication that the burdened vessel was about to fail in her duty. To require the privileged vessel to act before such time would be to nullify the general rule. The captain of the schooner says that it did not appear to him that the tug would not, or could not, fulfill her obligation until she crossed the line of his course. I am disposed to agree with him. He was then, he says, only 400 feet off. No other evidence leads me to doubt this estimate of distance. The testimony of the captain of the tug that when both the tug and the first barge had crossed the schooner's course the latter was a quarter of a mile away is so obviously at variance with the surrounding facts as to be without weight. Until the tug crossed the schooner's course, if she could not stop, or even slow down, she could, as Capt. Gray says, have swung across the channel far enough and long enough to permit the schooner to pass. When, then, the tug crossed the schooner's course, and it became apparent that the schooner must act to avoid collision, Capt. Gray

says he immediately "hove his wheel hard up" and called all hands to the spanker. The peak of the spanker was let down, and the schooner veered around from southeast to about east, and proceeded on a parallel course with the tug and tow until, with the light wind and tide, she got beyond control and drifted against the Ropes. It is true that two schooner captains, who watched the collision from a distance of a mile and a half, testified that the tug had gone 300 or 400 feet across the schooner's course when the peak of the spanker fell. I would not rely upon estimates of distance made under such circumstances, even if the witnesses were positive about it. That the tug had crossed the schooner's course at that time, as testified by one of the schooner captains whose line of vision would enable him to see when she came out on the other side, may well be believed. But that fact does not indicate lack of expedition on the part of Capt. Gray. The tug was going steadily forward, while the schooner lost headway in making the maneuver. Under all the circumstances I am of the opinion that the schooner was not at fault.

[3] In the consideration of events subsequent to the collision, it is to be noted that no question is raised with respect to the action of the master of the Ropes in casting off the Conner and the Endicott. It is asserted by the claimants, however, that the loss was the proximate result, not of the collision, but of the neglect of the captain of the barge after being cast off. So far as it is possible to resolve the contradictions in the statement made by Capt. Printz, of the Conner, his account is substantially this: When he discovered that the hawser had been cast off, his barge was 100 fathoms west of buoy CB$^1$. He realized at once the necessity of anchoring, and thinks he had his port anchor down when the tug signaled him to anchor. As the barge swung around coming up to the tide on her anchor, she went by the buoy, and her stern grounded. It was therefore useless to drop his other anchor. The distance from the place of collision to the place of grounding was 1,000 fathoms (he changed this later to 1,000 feet), and not more than five minutes elapsed from the time he started to drop his anchor until the barge stranded. On cross-examination, however, he stated that various efforts which he made to avoid being run down by the Endicott and to get back into the channel, before dropping his anchor, took four minutes. If he was four minutes in dropping his anchor, he could not have had his anchor down until long after the tug signaled him. Moreover, in that interval the tide (if four knots, as he claims), would have carried the barge beyond the buoy mentioned. His testimony concerning the length of chain let out is hardly convincing. Assuming, however, that he had out from 45 to 60 fathoms, as he claims, it is evident that the barge could not have swung around the buoy CB$^1$ and grounded within that distance, as he states, since it is 400 yards from the buoy itself to the nearest point upon which she could have grounded, or where any of the libelants' witnesses claim that she did ground. Apart from its inconsistencies, Capt. Printz's narrative is discredited by a clear preponderance of the evidence.

The fact that the schooner, after the collision, proceeded on her

way between the Conner and buoy CB¹ proves, at all events, that she was cast off considerably to the westward of that buoy. Capt. Gray, of the Kelly, says that when the schooner straightened out on her course after the collision, and the Conner was then on a line with the black buoys, some 500 feet west of him, he heard the barge's anchor chain rattling out. Capt. Linne, of the Ropes, fixed the place where his barge was when he cast off the hawser at a point over 500 yards west of buoy CB¹. Capt. Miles, of the Luckenbach, marked the place where the Conner was when she cast off at a point 400 yards west of that buoy. Upon a consideration of all the evidence, I find that the Conner was approximately 400 yards west of buoy CB¹ when she was cast off.

The place where the barge grounded is fixed by the captain of the tug at a point about 800 yards southeast of the place where she was cast off (marked "C" on libelants' Exhibit 3). Other witnesses fix it at the same place. But in all instances their conclusion is little more than conjecture. The location could only be made by them with reference to the estimated distance of the stranded barge from the buoys; and the difficulty in making an accurate estimate, under the circumstances, is well known. A comparison of the estimates of time and distance made by the various witnesses in this case will show how unreliable such testimony is. The only location of the wreck that can be relied upon is the location made by the United States engineers five days after the stranding, and again about five weeks later. The only criticism attempted to be made of this location is that no compass bearings were taken. But compass bearings were unnecessary. The location thus made is about 1,200 yards southeast of the point where the barge was cast off (marked "Y" on libelants' Exhibit 3). That this was also the place where the barge originally stranded, I have no doubt. Apart from the testimony of witnesses who locate it there, the testimony of the captain of the barge and the captain of the tug is conclusive on this point. The tide flowed into the barge and filled her up, and all the tug's efforts to release her at high tide were unavailing. No witness who saw her condition had any idea that she moved after grounding; and it remained for counsel to suggest that a barge in her plight, with over 2,000 tons of coal aboard, and a 3,-500-pound anchor down, could have shifted nearly 1,000 feet without breaking up.

My conclusion is that the Conner went aground not far from three-quarters of a mile southeast of the point where she was cast off. The tide was certainly less than three miles an hour. Its normal strength after it becomes steady is only a trifle over two miles, and no abnormal conditions were shown. It appears, therefore, that from 12 to 15 minutes must have elapsed between the casting off and the stranding. If she dragged her anchor, her speed would be less than the strength of the tide, and the time would be longer. Neither the captain of the tug, nor the captain of the Conner, saw the hawser cast off; but both discovered the fact almost immediately afterward. The necessity of anchoring at once was obvious; but the captain of the Conner claims that before doing so it was necessary for him to maneu-

ver, so as to avoid being run down by the Endicott. His testimony concerning his efforts in this direction is so conflicting as to be unintelligible; and the preponderance of the evidence is clearly against his claim that the Conner and the Endicott had any considerable headway when cast off. It is to be remembered that the tug had slowed down just before this, and the captain of the Ropes testified that he was unable to steer his barge, because she had no headway. Moreover, if the fact that the Endicott was attached to his barge hindered his anchoring, the captain of the Conner should have cast off the hawser. The Endicott drew so little water that there was no danger that she would ground.

The situation, then, appears to have been this: There was a collision between the schooner and the barge Ropes, in which, however, the contact was so slight that no damage was done to either vessel. Nevertheless the captain of the Ropes, in the exercise of what is conceded to have been a wise precaution under the circumstances, cast off the hawser connecting the two following barges. It was the obvious duty of the captain of the Conner to anchor at once, even if he had not been signaled by the tug to do so. Eventually he did so, dropping his 3,500-pound port anchor. The evidence shows that the bottom was good for anchorage; and that the anchor put over should have sufficed to hold such a barge, if sufficient chain were put out. Nevertheless, about 15 minutes later the barge was carried by the tide and cast aground on a shoal spot nearly three-quarters of a mile distant, with the 3,200-pound starboard anchor on board. The necessary conclusion is, either that the captain of the barge neglected to anchor until just before grounding, or that, although he did put over one anchor shortly after being cast off, the barge dragged on the anchor, and he neglected to give out sufficient chain, or, at all events, to put over his second anchor. In view of the irreconcilable conflict in the testimony, it is very difficult to determine just what happened. Evidently Capt. Printz did not get his anchor down as quickly as he claims. But I believe that the barge dragged her anchor for a considerable part of the distance traversed, due to the action of the tide and swell on a short anchor chain. In either event the neglect on the part of the captain of the barge to take the simple precautions which the situation required constitutes the proximate cause of the stranding. It is not a case of concurrent fault on the part of the tug and the barge. The fault of the barge was not a contributing cause. It was, under the circumstances, the efficient and proximate cause of the damages claimed. The evidence shows that Capt. Printz had ample opportunity, after learning that his barge was adrift, to anchor her. There was nothing in the surrounding circumstances to cause any particular excitement on the part of an experienced mariner in the fact that his barge was cast adrift, and he was ordered to anchor. It was a simple, obvious precaution, and called for the exercise of merely ordinary care. If Capt. Printz had exercised ordinary care, the barge would not have grounded.

The libel and petition are dismissed, without costs.