In re BARRETT et al. and six other cases.

THE RICHARD J. BARRETT.

United States District Court
S. D. New York.
Nov. 28, 1952.

Adrian J. O'Kane, New York City, for petitioner Edward E. Barrett.

Burlingham, Veeder, Eugene Underwood, New York City, of counsel, Clark & Hupper, New York City, for North Atlantic & Gulf Steamship Co., Inc.

Hanrahan & Brennan, New York City, William R. Brennan, Jr., New York City, of counsel, for M/V Nonsuco Corp.

Hagen, Senecal & Eidenbach, New York City, Henry C. Eidenbach and Nelson J. Johnson, New York City, of counsel, for petitioner Mathiasen Steamboat, Inc.

Myles J. Lane, U. S. Atty., New York City, By Pyne, Lynch & Smith, New York City, Anthony V. Lynch, Jr., and Vincent J. Ryan, New York City, of counsel, for United States of America.

Rolnick & Asofsky, New York City, Irwin Asofsky, New York City, of counsel, for Louis J. Depland, Jr.

RYAN, District Judge.

Gentlemen, I am now prepared to give you my findings of fact and conclusions of law in these cases. Before doing so, I want to thank you, on behalf of the Court, for the cooperation you have given us in disposing of these suits.

A welter of litigation has followed in the wake of the attempted disastrous towing as a dead ship of the S. S. Samcree from Pier 67 down the East River, on the afternoon of August 15, 1947. Seven suits —six in the admiralty and one at law— have by consent been submitted for decision by me upon the stipulated record of a trial had before my brother Judge, who because of illness has been unable to ren-

der his judgment on the evidence so presented to him. After consideration of the record now before me, I make the following findings of fact.

The S. S. Samcree was an oceangoing vessel built in 1944 with deadweight of 10,521; net tonnage, 4380; gross tonnage 7219. She was owned by the United States of America and husbanded by American Foreign Steamship Corporation, a New York corporation with an office and place of business within this district, under the usual form of "General Agency Agreement, 4/4/42." She had for some time prior to July 1, 1947, been under lend-lease to the British Ministry of Transport, and on that day had been turned over to American Foreign Steamship Corporation, as general agent, for the then instructed purpose of putting her in shape for operation. She was docked on the south side of Pier 67, at East 20th Street, East River, on July 11, 1947, and remained there until the afternoon of August 15, 1947.

Shortly after July 14, 1947, it was determined not to maintain her in service and the general agent was instructed to have the vessel prepared to be taken by tug to the lay-up fleet in the James River, Virginia. A skeleton crew and additional men hired from the Hercules Company undertook to do the work preliminary to the lay-up. The tackle and deck equipment were placed below; the machinery and engines were cared for and measures taken for their preservation. While this was going on and at least five days before its completion, Eugene H. Tannehill, who was Assistant Port Captain of the general agent, came aboard the ship to see that she was made ready. He supervised this work.

Finally, on August 15, 1947, the work was completed and the American Foreign Steamship Corporation hired Mathiasen Shipping Company, Inc., a Delaware corporation, with an office and place of business within this district, to tow the Samcree from Pier 67 to Greenville Anchorage, New York Harbor, where she was to be taken over by a seagoing tug and her tow completed to the James River.

William J. Scanlan, the Master of the Samcree, left the ship about one p. m. to go to the Customs House in lower New York to clear the ship for departure from port. There remained aboard Captain Tannehill, whom the Master accepted as the owner's representative; William H. Minarik, chief mate; Jacob Spiegel, second mate; an able-bodied seaman; a cook and eight men from the Hercules Company. All were to assist in unberthing the Samcree and all including Captain Scanlan, who planned to board his ship, while she was in tow further down the river, were to remain on board during the voyage to the James River anchorage.

The towing was performed by the Mathiasen Shipping Company, Inc., under a written contract with American Foreign Steamship executed May 1, 1946. Mathiasen Shipping dispatched four tugs to Pier 67—Helen M. Mathiasen, Mathiasen Girls, Mathiasen Line and Richard J. Barrett.

The tug Helen M. Mathiasen was built in 1882. She was 104.2 feet in length, 20 feet beam, net weight 63 tons, and had a registered power plant of 500 h.p. She was owned by Mathiasen Steamboats, Inc., a Delaware corporation, doing business within this district and operated by Mathiasen Shipping Co., Inc., under a bareboat charter.

The tug Mathiasen Girls was constructed in 1888 and subsequently repowered with 550 h.p. diesel engines. She was 87 feet in length, 20.1 feet beam, net weight of 73 tons. She was owned by Mathiasen Transportation Co., Inc., a Delaware corporation, transacting business within this district and operated by Mathiasen Shipping Company, Inc., under a bareboat charter.

The tug Mathiasen Line was built in 1887. She was 84 feet in length, 19.7 feet beam, registered for 350 h.p., net weight 47 tons. She was owned and operated by Mathiasen Shipping Co., Inc. She became a total loss as a result of the disaster in the towing operation here involved.

While it appears that all of the various Mathiasen Companies were separate legal entities, the stock ownership in each was vested in identical parties in identical proportions. All of these corporations were

managed and operated by Mathiasen Shipping Company, Inc.

The tug Richard J. Barrett was owned and operated by Edward E. Barrett and William Bowman, under the name E. E. Barrett & Co., which maintained a business office within this district. The Richard J. Barrett was built in 1919, of 176 gross tons, 95.5 feet long, 24.7 feet beam and 12.2 feet depth, with 750 h.p. registered. She is represented as one of the more powerful tugs working in New York Harbor, and was the most powerful tug employed in the towing. It was to obtain this power that Mathiasen Shipping Company hired this tug and arranged that in the towing she should be under the direction of the pilot.

Fred Johansen was captain of the Mathiasen Girls; Axel G. Larson was captain of the Helen M. Mathiasen; and George Fuhr, captain of the Mathiasen Line. Aboard the Richard J. Barrett, George B. Young was captain, Nils H. Larson, mate, and Edward V. Yackshina, deckhand.

Although the tugs reached Pier 67 at about 3 p. m. to begin the towing, the departure was delayed because of the necessity of complying with the Coast Guard regulation requiring that a lifeboat be in position. All the lifeboats had been stored below; it was necessary to send for a shore crane and remove one of the lifeboats from a hold and put it back on its davits.

When the tugs arrived, they could not pull alongside the Samcree because a derrick tug of Merritt-Chapman Company was still tied to her. Captain Axel Larson of the Helen M. Mathiasen went to the dock and boarded the Samcree by the gangway. He was instructed to wait. He observed the derrick hoisting a lifeboat up to the davits; he returned to his tug.

While waiting for the Samcree to be made ready for towage, Captain Larson, who later acted as the pilot of the Samcree, gave the tugs instructions as to the positions they were to take and the tasks assigned to them in the towage. The Mathiasen Girls was directed to pull the ship out on the stern line; the Mathiasen Line to go to the starboard bow and the Richard J. Barrett to take the hawser off the Samcree as she came out of the slip. After the Mathiasen Girls got the Samcree out in the stream, she was instructed to let go the line leading to the stern of the Samcree and come to the ship's starboard quarter.

A little after four p. m., the Merritt-Chapman tug pulled away, the Helen M. Mathiasen came along and made fast on the port quarter of the Samcree and Larson again went aboard—this time up the ship's ladder from the tug. He found a number of men aboard; none wore uniforms but one or two seemed to be in charge. He was advised that all was ready and the tugs were signalled to proceed as previously instructed. The maneuver was executed as planned; the ship was undocked and pulled out into the stream.

When she was undocked from Pier 67, at approximately 4:25 p. m., the Samcree was without power of any kind; she was without load, and in her light condition she had about 20 feet of freeboard amidships. The distance from the waterline to the top of her superstructure was about 45 feet. She was equipped with the usual Liberty ship funnel, three masts and a cabin aft, all of which offered surface resistance to the wind. She was riding high in the water drawing only six feet, two inches in the bow and eleven feet, ten inches aft.

When the towage began the weather was warm and clear; although it was verging on being humid, it was a beautiful day. The sun shining, no wind, and all was bright with no omen of impending disaster. The tide was practically slack as she left the pier and as the tow proceeded under way the tide started to come flood.

As the Samcree was being undocked, the Chief Officer, Minarik, went to her stern to be ready to take care of the aft unmooring and to see that the lines from the stern were cast off. The Samcree had five mooring lines to the dock—two head lines, a spring line and two stern lines—all 8-inch manila. The eight Hercules men assisted in taking in the lines; there was no steam and the lines had to be taken in by hand. It was from one of these lines that the hawser which was paid out to the Richard J. Barrett was selected by Tannehill. He picked out as

the towing hawser the line which had held the Samcree fast to the dock from her port bow. There was some question as to whether it should be passed through the rolling chock on the port bow or the chock on the starboard bow so the line was first hauled all the way in on board the Samcree. There it was seen by Tannehill "inch by inch"; he "had hold of every inch of it." It was run out to the Richard J. Barrett through the port bow chock, which was located forward of the anchor windlass, about three feet aft of the stem, and about six inches off plumb dead ahead of the hawsepipe.

Tannehill had assisted in pulling in the lines by which the Samcree was made fast to the dock, seeing that she got away from the pier, and in making the towboats fast to the sides of the ship. At no time did he do anything to see that the ship was made ready for the towing; he gave no orders to the men aboard as to the stations they were to take and assigned no specific duties to any of them.

The undocking of the Samcree was accomplished with the unorganized aid of those aboard her. Captain Larson was on the bridge alone directing his towboats from there, giving them signals by a mouth whistle. She was pulled out into the stream by the Mathiasen Line, with the Richard J. Barrett on the bow.

When the tow got squared away in the river and was under way the tug Richard J. Barrett was ahead, with the Samcree on the 8-inch hawser; the tug Mathiasen Line was made fast on the starboard bow of the Samcree; the Mathiasen Girls fast on the starboard quarter; and the Helen M. Mathiasen fast on the port quarter. The tugs employed were sufficient in number, of ample power and placed in proper position. The tow proceeded down the river holding a course slightly to the Manhattan shore or west of midstream. All went well until it reached beyond Manhattan Bridge; it had then traveled a distance of about two miles down the river.

The tow was proceeding downstream bucking a full flood tide. It reached a point between the Manhattan and Brooklyn Bridges, when a thunderstorm with high winds hit the flotilla; it was then about off Pier 27. From 5:11 to 5:16 p. m. the wind velocity was 42 miles from the southwest; it was of gale force, but not unusual for a midsummer thunderstorm in the New York area. The sudden winds struck the high sides and superstructure of the Samcree. The forward movement of the flotilla was stopped; it could make no headway and soon the Samcree and the tugs went into a drift upstream and towards the piers of the Manhattan side of the river. With the gale came a blinding rain, striking the flotilla on the port side.

Properly and securely moored to the south side of Pier 33 was the Motor Vessel Nonsuco. She was tight, sturdy and in all respects seaworthy, and properly manned and officered. She was owned by the M. V. Nonsuco Corporation, which was organized under the laws of the Philippine Islands.

When the storm broke Tannehill was in a recessed alleyway on the port side talking to the second mate. They were "chewing the breeze there" when a danger signal was sounded by the tug Mathiasen Line which was made fast to the starboard bow of the Samcree. Some of the Hercules men and some of the personnel of the Samcree had also sought shelter in the same alleyway. The Samcree was still coming astern, making for the Manhattan shore very rapidly. The Richard J. Barrett was out toward the center of the river; the hawser leading from the Samcree was stretched to its full capacity; she was giving all she had, pulling and trying to hold the Samcree up into the stream and away from the shore.

It was then raining pretty hard and the wind was steady and very strong. Tannehill ran across the No. 4 hatch to look at the towboats on the starboard side, arriving there just as the Mathiasen Line was being trapped. She was being pinned between the side of the Samcree at the break of the bow and the stern of the Nonsuco. The situation of the tug had already become hopeless; there was nothing that could be done to help her. She was going

down very rapidly. When she had sunk Tannehill went to the aft bitt and released and cast off the eye of the line to the Mathiasen Girls, the tug on the starboard quarter of the Samcree. The Mathiasen Girls was also in danger. As the stern of the Samcree started to come in, she threatened to pin this tug too. Aboard the Mathiasen Girls they were slacking their lines. The Mathiasen Girls was able to get out of her predicament and away from the Samcree.

Tannehill then ran to the port anchor to drop it. He had to travel about 200 feet against a strong wind. He didn't make much headway and from the bitt on the starboard quarter it took him about two minutes to reach the bow and the port anchor. While he was trying to unscramble the anchor, the hawser to the tug Richard J. Barrett parted. The port anchor was dropped on two shot of chain. It "went bouncing like a ball across the river bottom"; he watched to see whether it would hold; he waited for a minute, and made ready to drop the starboard anchor. When the port anchor did not stop the drift of the Samcree, the starboard anchor was finally cleared and dropped on about three shot of chain. The two anchors held the ship; she fetched up and stopped her movement astern. But, before she came to rest, the Samcree had continued on the way, drifting upstream, hitting ships and piers all the way up the river "like a billiard ball." It was to Pier 40 that a line was finally put out to stop the yawing after she had come to rest.

When the storm broke and the rain came with the wind, the second mate Spiegel had also sought shelter on the windward or port side of the ship, just aft of the housing. Here he had been joined by some of the crew and by some of the Hercules men. It was a separate group from that in which Tannehill stood. They, too, had busied themselves keeping out of the rain and smoking. None were concerned with seeing that measures were taken to see that the ship rode out the storm safely. There, they remained until the danger signal was sounded by the Mathiasen Line. Then, Spiegel ran across No. 4 hatch to the starboard side; who, if any of the gang, went with him is in doubt. Looking over, he saw the Mathiasen Line "in extremis"; she was rapidly going down. As the stern of the Samcree started to swing in threatening to pin the Mathiasen Girls, he helped remove the eye of her line from the bitt. Going then to the forecastlehead, he found the port anchor already out and the ship still being carried by the storm. He went to the starboard anchor and set to work to back off the brake, ultimately clearing it.

There was complete confusion among the crew of the Samcree during the drifting. No one in command intelligently exercised authority; no one directed or coordinated the work or the actions of the men. The Master was not aboard; when the storm broke, the Assistant Port Captain was aft of the midship's house; so was the second mate, and the chief mate. No officer was on the bow and none of the crew were stationed or assigned there. No one was directed to make the anchors ready, no one was assigned to the lines or to act as lookout.

Tannehill, the representative of the owners of the Samcree as assistant Port Captain, regarded and accepted Chief Mate Minarik as the officer in command of the ship during the tow. But Minarik was uncertain of his authority and he did not know whether under company regulations he outranked Tannehill, but he did understand that Tannehill was to assist in "getting the ship away from the dock, getting her down to the point where Captain Scanlan would come aboard and take over."

During the entire towing and until the Samcree was finally secured to Pier 40 after the storm, Chief Minarik did not once go up on the bow of his ship. At no time did he inspect the anchors after the ship was unmoored; he remained on the after welldeck, walking around.

The anchors of the Samcree were in a fine mess for a dead Liberty ship under tow, on a much-traveled river. Her anchor gear was the customary Baldt anchors of about five tons apiece, located one on the port and the other on the starboard bow.

They were held in place by the conventional rig of windlass, wildcat, brake shoe and stopper. The stopper was of the devil claw type, and consisted of an inch and a quarter turnbuckle; four or five lengths of ⅞ patent link chain, held together with the devil claw and fitted over the link of the anchor chair to serve as a safety measure in the event that the brake happened to carry away. To get the devil claw off the chain on both anchors it was necessary to back off with the turnbuckle about four inches, thus lengthening the chair stopper sufficiently to free the devil claw. The result was that neither anchor was dropped until the Samcree had drifted 1000 feet and the starboard anchor was not dropped until Pier 36 had been hit.

The distance from Pier 27 to Pier 29 is 150 yards; from Pier 29 to Pier 33, where the Samcree struck the Nonsuco, 325 yards; from Pier 33 to Pier 36, 250 yards; and from Pier 36 to Pier 38, 175 yards.

After the starboard side of the Samcree slid up the stern of the Nonsuco, crushing and sinking the Mathiasen Line, which fetched up underneath the stern of the Nonsuco, the Samcree continued on her drift up the river.

Before the storm abated and the anchors of the Samcree took hold, she collided with the S. S. Stephen Mallory which was properly moored at the south side of Pier 36 and damaged her. The Stephen Mallory was owned by the United States and was under bareboat charter to Waterman Steamship Company. The Samcree also came in contact wtih the stern of the S. S. Eleazer Wheelock, moored on the north side of Pier 38 and damaged her and Piers 36 and 38. The Wheelock was owned by the United States.

Meanwhile Captain Scanlan, after clearing the Samcree at the Customs House, engaged a launch at the foot of Wall Street and proceeded up the river to meet the tow and board his ship. He reached the tow just above Manhattan Bridge and from the launch boarded the Helen M. Mathiasen expecting to climb a ladder to his ship. Looking down the river he saw the squall coming and went into the tug's wheelhouse for shelter. He was there when the storm struck. During the heavy rain and wind, the windows of the wheelhouse were almost continuously blacked out and he could see but little of what was happening to the tow. Being on the tug made fast to the port quarter of the Samcree, his ability to observe what was occurring to the tow was limited. He was not able to board the Samcree until after the storm. It was to Pier 40 that the aft line of the Samcree was made fast to a bollard on the dock; second mate Spiegel taking in the slack as she came in on her inswings on the anchor chains.

After the disaster, it was found that the 8-inch manila hawser on which the Samcree was being towed by the Richard J. Barrett had parted right at the splice of the eye. The hawser was a three-strand line and it was evident that one strand had stranded, reducing the tensile strength of the line and causing the remaining two strands to go. The eye was intact but there remained evidence of improper and faulty splicing. It could be seen that one of three strands had pulled down inside the other two, leaving these "sort of hemmed over the one strand." In the splicing the three strands should have been pulled out so that they fitted naturally into the lay of the rope, but improper splicing had resulted in one strand being pulled too far up so that it buckled. This faulty splicing reduced the strength of the hawser by about 50%.

The strain to which the hawser had been subjected by the tow just prior to parting produced a distortion which would have made evident, even at a casual glance, the improper splicing; but, prior to the distortion, parting and such faulty splicing could have been detected only by a thorough examination accomplished by taking the splice in hand.

Petitions for limitation of and exoneration from liability have been filed by the owners of the tugs Richard J. Barrett (A. 154–205), of the Helen M. Mathiasen (A. 154–209), of the Mathiasen Girls (A. 154–

207) and of the Mathiasen Line (A. 154–208).

Louis J. Depland, Jr., was chief steward of the Eleazar Wheelock. He has filed a libel in admiralty (A. 156–200) against the United States of America, American Foreign Steamship Corporation, and the Samcree, for injuries he alleges he sustained while aboard the Wheelock at the time she was struck by the Samcree. He has also filed claims in the limitation proceedings.

Domingo San Jose, a fireman on the tug Mathiasen Line, was lost when she sank. Claims have been filed in the limitation proceedings by Frank San Jose, a brother of the deceased seaman and by the Public Administrator of Kings County, New York, as the administrator of the estate of the deceased.

The United States of America, as owner, has filed claims in the limitation proceedings for damage to the steamships Samcree, Stephen Mallory and Eleazar Wheelock. Claim has also been filed by Waterman Steamship Company as charterer for damage to the Stephen Mallory. Claims have been filed too by the City of New York and Waterman Steamship Company, lessee, for damage to Piers 36 and 38 and by the City of New York and Fearnley & Egger Company, lessee, for damage to Pier 33 and the bulkhead between it and Pier 32. United States of America has also made claim against North Atlantic Steamship Company, Inc., for $1020 damage sustained by the S. S. Eleazar Wheelock, North Atlantic having rejected this claim and refused payment. The United States has deducted and withheld that amount from moneys otherwise admitted to be due North Atlantic from the United States.

North Atlantic and Gulf Steamship Co., Inc., was the tenant in possession of Piers 36 and 38. It was also the bareboat charterer of the S. S. Eleazar Wheelock.

North Atlantic and Gulf Steamship Co., Inc., has filed a suit in law (Civ. 46–344) against the United States of America. It is also a claimant in the three Mathiasen limitation and exoneration proceedings but not in the Barrett limitation proceeding. North Atlantic sued and claimed as tenant in possession of Piers 36 and 38, and as bareboat charterer of the S. S. Eleazar Wheelock to recover the cost of repairs to the piers and for damage to the vessel.

M/V Nonsuco Corporation as owner of the motor vessel Nonsuco filed a libel in rem against the Samcree and the United States of America as her owner, and American Foreign Steamship Corporation, as operating agent; in rem against the three Mathiasen tugs and against Mathiasen Shipping Co., Inc., as owner; in rem against the tug Richard J. Barrett and against E. E. Barrett & Company as owner (A. 154–205). Nonsuco seeks recovery of damages sustained by the M/V Nonsuco by reason of the collision between her and the tug Mathiasen Line. Nonsuco is also a claimant in the Barrett limitation and exoneration proceedings.

[1] Specifically, I do conclude that the fault of the Samcree was the proximate cause of her uncontrolled drifting and of the damage inflicted by her in the drifting. I conclude that at least three specifications of fault on her part are sustained by the evidence: she was at fault in that she furnished and supplied a defective hawser to the lead tug, Richard J. Barrett; in that she failed to maintain her anchors ready and in condition for immediate use and properly manned in time of danger; in that there was a complete lack of intelligently exercised authority on the part of those in command aboard the ship.

The M/V Nonsuco was a properly moored vessel and she was possessed of the highest degree of privilege. "There is not only a presumption in her favor, by the fact of her being at anchor, but a presumption of fault on the part of the other vessel". The Oregon, 1895, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943. The Samcree to sustain the defense of inevitable accident "must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required". The Hylas, 1925 A.M.C. 921, 925. This she has entirely failed to do.

718

■ North Atlantic and Gulf Steamship Co., Inc., is entitled to be relieved of responsibility for the damage sustained by the S. S. Eleazar Wheelock and to recover the cost of repairing the damage to the ship and to Piers 36 and 38 from the United States. The claims filed by it in the three Mathiasen limitation and exoneration proceedings are dismissed.

The pilot, Captain Larson, had held an unlimited master and pilot license since 1917 and for thirty years had been navigating in New York Harbor. He was experienced in the docking, undocking, towing and piloting of vessels of the class of the Samcree. When he boarded the Samcree, he found Tannehill in charge of her crew and he was told by Tannehill when the vessel was ready for towing. He went up on the bridge of the Samcree; he was in charge of the navigation in her undocking and towing, but command of the ship and direction of the men remained with the officers of the Samcree.

Larson, although he came as the master of the Helen M. Mathiasen, and was supplied by Mathiasen Shipping Company, Inc., as the pilot of the Samcree, was paid by the American Foreign Steamship Corporation for his services as pilot. Mathiasen Shipping Company, Inc., was paid by American Foreign for the hire of the four tugs used in the towing; Larson received his pilotage fee directly from American Foreign—$25 for piloting the Samcree to Greenville Anchorage and an additional $25 for escorting the ship through the Narrows and out to Sandy Hook. Larson was, at least during the time here in suit, the employee of American Foreign, as general agent of the Samcree, and not of Mathiasen Shipping. Be that as it may, there was no fault on the part of Larson during the towing.

The only negligence which might be attributed to Captain Larson would have to be predicated upon his failure to see that the anchors were ready for immediate use before the towing operation commenced, or upon his failure to order the anchors to be dropped when they should have been. But neither of these tasks was his, and he was not expected under his employment to perform them.

Although the physical towing of the Samcree was under the direction of Captain Larson, as pilot, the management and direction of the men and crew aboard was not entrusted to him but was retained by Assistant Port Captain Tannehill and Chief Minarik. Even the master, Scanlan, had arranged on return from the Customs to board the ship while under tow down the river. The special circumstances here present distinguish this towing operation from that where a towing company has been engaged as an independent contractor to tow a completely dead ship and where it is given sole charge not only of the navigation but of control of the ship. Cf. The Doris Eckhoff, 2 Cir., 1892, 50 F. 134, The Barendrecht, 2 Cir., 9 F.2d 614.

■ It cannot be questioned that when the tow is "the passive instrument of the harm", it "does not become one with the actively responsible vessel by being attached to it." Liverpool, Brazil & River Plate Steam Nav. Co. v. Brooklyn Terminal, 1919, 251 U.S. 48, 40 S.Ct. 66, 64 L.Ed. 130. But here the Samcree was a "passive instrument" only in so far as her navigation was involved, the handling of the ship remained with her officers and crew. None of the tugs failed in their duty to exercise ordinary care and vigilance for the safety of the Samcree. The Samcree must be charged with knowledge that rough weather may be encountered in almost any towing operation, giving rise to emergencies in which a towline may break or must be cast off and anchors dropped on short notice to prevent uncontrolled drifting. So, too, that it is no secret that a vessel which is light will drift faster than one laden. The ever present possibility of the necessity for the prompt dropping of anchors requires that they be set for ready handling. The M. C. Luckenbach, D.C., 200 F. 630.

■ There was no fault on the part of the Mathiasen Shipping Company, Inc., in failing to discover the latent defect in the hawser which had been run out from the Samcree to the tug Richard J. Barrett. It cannot be held that there was a failure of the exercise of ordinary and reasonable care in accepting the hawser when it was

tendered for use. Cf. The Sunnyside, 2 Cir., 1918, 251 F. 271.

Since the tugs employed by the Mathiasen Shipping Co., Inc., were entirely seaworthy and properly manned and the pilot Larson was not in its employ, the Mathiasen Shipping Co., Inc., is not liable in personam.

The captain of the Richard J. Barrett was a competent navigator. After the Barrett left Pier 67 and came down to Corlears Hook, he maintained a course in the middle of the river, slightly in towards the Manhattan shore. There was considerable traffic on the tug's port side and she stayed as close to mid-stream as possible. She was guilty of no fault in navigation.

The crew of the Barrett was under no duty to minutely examine the splicing on the eye of the hawser which was passed out to her from the Samcree. There was neither time nor opportunity to make such an examination and the Barrett was not at fault in failing to discover that the hawser was defective.

As the tow drifted rapidly toward Pier 33, the Mathiasen Line could not get away. When her captain cast off the Samcree's line from his tug, it was of no avail. The tug was not at fault in doing this; she was merely attempting to extricate herself from imminent collision with the moored Nonsuco.

All of the tugs employed in the towage were properly navigated and no fault is chargeable to any of them. All the petitions for exoneration from liability are granted.

The United States of America is liable in personam for the fault and negligence of the ship's officers on board the Samcree and is liable in rem as the owner of the Samcree because of the unseaworthiness of the vessel.

Let the suit filed by seaman Depland be brought on for an early hearing before me so that the amount of damages may be determined.

Let appropriate decrees in the other suits be submitted on notice in conformity herewith.