**NEPTUNE TRANSPORTATION CORP.,**
Libelant,

v.

**THE Tug BARTOW, her engines, etc. and Moran Towing and Transportation Co., Inc., Claimant-Respondent.**

No. 180–271.

United States District Court
S. D. New York.
July 5, 1956.

George J. Hammerman, New York City, for libelant.

Burlingham, Hupper & Kennedy, New York City, for claimant-respondent.

THOMAS F. MURPHY, District Judge.

This is a proceeding in admiralty by the owner of the steel tank barge Varick against her tow for damages to the barge by reason of the tow's negligence.

The barge and her tow left Stamford, Connecticut, on October 25, 1953, after discharging her cargo of bunker oil and headed for Bayonne, N. J. via Long Island Sound. It proceeded without incident in tow behind the Tug Bartow on about 75 fathoms of hawser. Shortly after 2:00 p. m. as the tug and her tow rounded Throggs Neck on the East River the tug gave the 3-long and 2-short blasts indicating it was going to shorten hawser and take the barge alongside. At that time the barge had on board two in crew, John Zuvich, a deckhand who had been a deckhand on a number of barges in New York Harbor waters since 1949. He had no certificate from the Coast Guard but secured one as an Ordinary Seaman and Wiper after the accident in question. The other member of the crew was Joseph Zuvich who had been sailing in New York Harbor since 1944 and had a First Class New York Harbor Pilot's License from the Narrows to the Battery which was issued to him July 11, 1951. He had been working on the Varick with time off since October 1, 1953.

The certificate of inspection from the United States Coast Guard then in effect for the Barge Varick had the following requirement for the complement of the crew:

"3 crew (2 Able Seamen, 1 Ordinary Seaman) including 2 Tankermen and 1 Lifeboatman. When navigating on a harbor or river route exclusively, Deckhands may be carried in lieu of Able Seamen and the Lifeboatman may be dispensed with. When not being navigated, a Tankerman may be berthed on board this barge to provide Watchman service as prescribed in Section 35.05–15 of the Tanker Rules."

The testimony for both sides is in agreement that after the tug gave its signal to shorten hawser only one of the crew of the barge, John Zuvich, responded. It is also in agreement that the tide was ebbing and the wind moderate easterly and it was raining. When the hawser was shortened to about 15 or 20 feet from the barge John Zuvich was directed by the tug to let go of the starboard steel bridle. This he did and it was pulled aboard the tug without incident. He was then told to cast off the port bridle. It is Zuvich's testimony that he released it from its bitt and held onto the heaving line attached until he felt the crew of the tug taking in the bridle and he then cast it off. At this time the barge was still 15 or 20 feet away. As soon as he released the heaving line the barge started to drift toward the western shore. He then started to walk toward the stern of the barge. At that juncture he testified the captain of the barge yelled to him to drop the anchor. He thereupon called his partner, Joseph Zuvich, to help him. It is his testimony that they started to release the anchor but in order to loosen the shackles his partner had to go back to the cabin for a wrench and by that time the barge crashed into the catwalk of the Whitestone Light on the western shore. He estimated the time that transpired between the captain's order to drop anchor and the crash as ten minutes. He further testified that it was the practice for one man to respond to the command of shortening hawser although sometimes it was two, depending upon the tug captain's order. He admitted that he had never dropped an anchor before and that the anchor was not only shackled but had

its two brakes tied down with Manila lashing. On cross-examination he was not sure whether he held the heaving line while the hands on the tug were pulling in the port bridle nor how long he held it. At the Coast Guard hearing shortly after the accident he testified that he held the heaving line until the captain said "O.K." and then he let it go. He thought that at that time when the captain yelled to drop anchor they were about 100 feet apart. He insisted that he did not drop the heaving line before the bridle was being pulled in.

Joseph Zuvich testified that he was in the cabin when the tug gave its signal and did not respond since John Zuvich did. When he was called out by his partner they were then adrift and he started to make preparations to drop anchor but had to return to the cabin to get a wrench and before they had time to release the anchor they had grounded. In explanation of the Coast Guard certificate of inspection requiring a crew of three, he testified that there were three men assigned to the barge but the third man was on his time off and that the custom on tank barges since 1945, pursuant to the agreement with the union, was for two men on and one off. He also said the custom on receiving a signal to shorten hawser was for only one man to respond except when the barge was fully laden or the sea a little rough or when the captain ordered two. He also produced his validated seaman's certificate which authorized him to take any unlicensed rating except A.B. He was, therefore, merely an Ordinary Seaman. In the 25 days that he was assigned to the barge the plan was to work seven days and have four days off and then work seven days and have three days off. Therefore, he actually worked on the barge before the day of the accident only 15 days. He admitted that the barge was light and it had a draft of about two feet forward and two feet three inches aft and that the tide was ebbing for an hour or two, and that they were proceeding south about seven or eight knots and that there was sufficient strain on the

hawser at all times and there had been no riding up on it. When he looked up before the crash he said the tug was on his starboard beam. He admitted that there was no provision for securing the anchor by just lashing it with Manila line so that it could be released by cutting it, and that there were no tools on the bow and he had to send to the stern for some in order to free the shackles. He knew, too, that it was the usual practice to shorten hawser near Throggs Neck. Both barge crewmen admitted that in order to heave anchor once it was dropped they would have to do it by a hand windlass and it was hard work.

The president of the Circle Shipping Company testified that he was manager of the Paragon Oil Company in October 1953 and had charge of the Varick. The libelant is a subsidiary of Paragon. He testified that he employed the three crew members and that two worked while one was off. After the accident he was told by the claimant-respondent that they denied liability because the barge had a crew of only two men in violation of its certificate. He said he went to the Coast Guard and complained and eventually they issued an amended certificate dated November 16, 1953, which provides: "When navigating on inland waters other than the Great Lakes, may carry 2 Crew (Seamen) including 1 Tankerman, 1 Lifeboatman."

It was stipulated that if an expert were called he would testify that the practice aboard barges was to shorten hawser with only one man but there would be exceptions which would require two men.

Respondent's proof consisted of the weather report, the tidal current charts, the tide tables showing the tide at Throggs Neck which was the same as Willet's Point and the correction table. These show that at the time of the accident the tide was slightly ebbing at half a knot and that the height of the tide was 6.9 feet, the wind at the Battery was 7–12 M.P.H. and it was raining but visibility was good.

Johnson, employed as a deckhand on the Tug Bartow, testified that after rounding Throggs Neck the whistle blasts were given to shorten hawser and they pulled in about 70 odd fathoms and when the barge was 15 or 20 feet away and the shackle for the bridle aboard his stern he told the barge deckhand to release the starboard bridle which was then pulled in without incident. He then told him to cast off the port bridle and he had about three or four feet of it in when something fouled beneath the tug. He went forward to call the captain and the captain yelled to the barge to drop anchor, to which the deckhand replied, "Who the hell is going to pull it up" and just stood there. He also testified that when he told him to release the port bridle he did not tell him to drop the heaving line.

The captain of the tug testified that when he gave the signal to shorten hawser he had stopped his engines and it was his intention to pick up the barge on his port side for better and easier handling. He marked on the chart in evidence his position when he gave the signal and estimated the distance to the Whitestone Light from that point to be a mile. After he told the bargeman to let go of the port bridle he went to the wheelhouse where in a matter of seconds his deckhand told him that the bridle was caught and at that point the barge was about 75 feet away when he told him to drop anchor and he said the bargeman just stood still. He said they tried to get the cable free and eventually did but the barge crashed. It was his testimony that it takes a minute or less to drop an anchor and that in that vicinity the river had a good muddy bottom to catch an anchor.

On all of the credible testimony I find that the tug was not negligent and the proximate cause of the grounding of the barge was the negligence of its crew and its fault in not having aboard the qualified crew required by its certificate of inspection. John Zuvich was negligent in casting off the heaving line before ordered to do so and this was what prob-

ably became fouled in the tug's propellers. John Zuvich was negligent also in not dropping the anchor since I find as a fact that he did not drop it because he was concerned more with the manual labor he would have to exert in raising it than with the safety of his barge.

The barge was at fault in its deficient crew and in not having an anchor that could be let go with dispatch. Cf. The M. E. Luckenbach, D.C.E.D.N.Y.1912, 200 F. 630, 637; In re Barrett, D.C.S.D. N.Y.1952, 108 F.Supp. 710, 718.

The libel is dismissed with costs.